Pennsylvania Railroad Company, Appellant, *v.*
Pennsylvania Public Utility Commission.

Argued June 12, 1962.  Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, MONTGOMERY, and FLOOD, JJ. (WATKINS, J., absent).

*Carl Helmetag, Jr.,* for railroad protestant, appellant.

*Louis J. Carter,* Assistant Counsel, with him *Joseph I. Lewis,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Peter Platten,* with him *Hamilton C. Connor, Jr.,* and *Ballard, Spahr, Andrews & Ingersoll,* for applicant transit company, intervening appellee.

*Edward F. Cantlin,* with him *J. H. Ward Hinkson,* for applicant transit company, intervening appellee.

OPINION BY FLOOD, J., September 13, 1962:

Over the protest of the Pennsylvania Railroad Company the Pennsylvania Public Utility Commission issued certificates of public convenience authorizing the Philadelphia Suburban Transportation Company (Red Arrow) and the Philadelphia Transportation Company (PTC) to operate a joint through bus service from Ardmore, Montgomery County, to 5th and Chestnut Streets in Philadelphia. Service along that part of the route in Philadelphia, from 54th Street and City Line to City Hall had been furnished theretofore in the morning and late afternoon hours by PTC's Bus Route 44. Service along the part from Ardmore to 54th Street and City Line had been furnished by Red Arrow as

part of its Bus Route I. Persons who wished to go by bus from Ardmore to central Philadelphia could have done so before over substantially the same route by making a change at City Line. There were, however, no transfer privileges between the two routes.

The net result of the protested certificates is that a passenger may, under the joint route, make an uninterrupted trip from Ardmore to any point along the former PTC Route 44 and along Market Street from City Hall to 5th Street, whereas previously he had to take one of the lines from Ardmore to City Line and then change to the other line for the balance of the ride to City Hall, but without transfer privileges. There will be service on the joint route throughout the day five days a week and on Wednesday evenings.

1. There is a preliminary dispute as to whether the proposed joint operation must be authorized by a certificate of public convenience issued by the commission.

The commission contends that a certificate is unnecessary because of the provisions of Sections 401 to 405 of the Public Utility Law, 66 PS §§1171-1175, requiring every public utility to furnish adequate service and make such extension and improvements as shall be necessary or proper for the convenience of the public in conformity with the regulations and orders of the commission (§401, 66 PS §1171); to make such arrangements for adequate service for the accommodation, convenience, and safety of the public as the commission may require (§403, 66 PS §1173); to make convenient adjustments and arrangements of schedules with those of like contiguous or connecting common carriers whenever the commission shall deem it necessary or proper for the accommodation, convenience and safety of the public (§404, 66 PS §1174) and to "construct and maintain, whenever the commission may, after hearing had upon its own motion or upon com-

plaint, require the same, such switch or other connections with or between the lines of a like common carrier, where the same is reasonably practical, to form a continuous line of transportation, and to cause the transportation of passengers or property between points within this Commonwealth to be without unreasonable interruption or delay, and shall establish through routes and service therein, and joint rates applicable thereto, and, where practicable, shall transport passengers or property over the same without transfer from the originating facilities." (§405a, 66 PS §1175(a)).

These sections give the commission broad powers to authorize or require carriers whose lines meet at any point to establish a jointly operated route over territory only part of which each is authorized to serve singly, but there is nothing in the language of the statute which permits such carriers to establish a joint route without a certificate of public convenience from the commission. With regard to motor carriers of freight, the establishment of through routes and interchange privileges has been held to require a certificate granted after proof that it is necessary or proper for the public service: *Lancaster Transportation Co. v. Pa. P. U. C.,* 169 Pa. Superior Ct. 284, 82 A. 2d 291 (1951) ; *Motor Freight Express v. Pa. P. U. C.,* 180 Pa. Superior Ct. 622, 121 A. 2d 617 (1956). Nothing in the public utility law indicates that there should be a different rule with regard to motor carriers of passengers. On the contrary, Section 202 of the Public Utility Law, 66 PS §1122, would seem definitely to require commission authorization. However, we need not decide this question since a certificate of public convenience was actually granted and the evidence sustains the commission's action in granting it.

2. The commission found that the proposal of the applicants to do in one joint operation what they are

now authorized to do separately in disjointed segments "will result in the elimination of needless inconvenience, hazard and waste of time, all to the benefit and convenience of the public". The railroad assails this finding as not consistent with the evidence.

It must be remembered that the heart of the application is the combination of two existing services the necessity for each of which has been presumably already demonstrated. We must also consider the mandate as to contiguous carriers in Section 405 of the Public Utility Law, 66 PS §1175, above quoted, requiring them to establish through routes without transfer and joint rates when the commission requires them to do so, either upon complaint or upon its own motion. It is to be noted, too, that the commission's authority to direct continuous service exists under §405 whenever it is "reasonably practical", and is not restricted to cases where the commission deems it "necessary or proper for the accommodation, convenience and safety of the public" as in §§401, 403 and 404.

The railroad contends that the new line caters to an entirely new group of persons and that there was no testimony that anyone had used the two existing lines by transfer at 54th Street and City Line to go from the Main Line to central Philadelphia, that there were no coordinated schedules to make such use feasible, and that the only evidence of necessity offered was (1) the type of service offered, its rates and its purpose, (2) testimony of nine representatives of stores which the new bus route would serve, and (3) testimony by eight members of the public that they would use the service, only one of whom said she would use it in place of her present use of a private automobile.

We do not agree that this is not substantial evidence of necessity. Nor did it stand alone. There was testimony by the solicitor of Lower Merion Township that the township commissioners were in favor of the

application and were of the opinion that the service would be of real value to a substantial number of the 60,000 inhabitants of the township. Mr. Frueh, whose expert qualifications in the field of public transportation were conceded by the railroad, testified that 24,-826 people live within one-half mile of that part of the combined route lying west of the Expressway. In that area the bus stops are not more than 1000 feet apart, and they are closer where the concentration of population justifies. Representatives of the applicants testified that the component parts were operating successfully and that a field interview indicated that the combined operation would meet with public acceptance.

The railroad complains that the testimony of the applicants presented their case on the basis of a public need for express interurban service by way of the Schuylkill Expressway, and that the commission's conclusion that the avoidance of the disadvantages of an interchange justify the approval of the applications is legally unsupported and should be reversed. However, the fact that there would be no stops on the Expressway between City Line and Market Street was only one of the advantages stressed in the applicants' testimony. Mr. Juram did testify, for PTC, that the adoption of service over the Expressway on other PTC routes resulted in a very substantial increase in the number of riders and gave as an example the increase from 6,300 to 25,000 passengers per week on PTC's Route A. But emphasis was also laid upon the transportation of persons from the Main Line to the Bala Shopping Center and other establishments along City Line, which does not involve transportation on the Expressway and is not express service. The applicants' witnesses also pointed out the advantages of the extension east of City Hall, which, for the first time, gives direct service from the Main Line to the department stores and other institutions located between City Hall

and Fifth and Market Streets. They also suggested that the new service will attract not only persons who now drive their private automobiles to Bala or to points east of City Hall, but also persons who now do not make these trips at all because of the inconvenience.

The quantum of proof of need for the combination of the existing services which is necessary to justify the commission's order must be considered in the light of its broad discretion under §405 to require the joint operation, without transfer, of two connecting routes when reasonably practical. In our opinion, the evidence of necessity was sufficient here.

3. The railroad next argues that the certificates should not have been granted without a showing and a specific finding of the inadequacy of the existing service.

Some of our cases have said that the grant of a certificate requires, not only a showing of need for the new service, but also proof of the inadequacy of the existing service, especially in cases involving proposed service identical, as to type, route and territory served, to that already being furnished by another carrier: *Reeder v. Pa. P. U. C.*, 192 Pa. Superior Ct. 298, 162 A. 2d 231 (1960) ; *Follmer Trucking Co. v. Pa. P. U. C.*, 189 Pa. Superior Ct. 204, 150 A. 2d 163 (1959); *Modern Transfer Company v. Pa. P. U. C.*, 179 Pa. Superior Ct. 46, 115 A. 2d 887 (1955) ; *Motor Freight Express v. Pa. P. U. C.*, 188 Pa. Superior Ct. 80, 146 A. 2d 323 (1958). The proposed service was also substantially identical with the existing service in *Hudson Transit Lines, Inc. v. U. S.*, 82 F. Supp. 153 (D. C. S. D. N. Y. 1948), relied upon by the railroad. On the other hand, necessity for the proposed service and inadequacy of existing service were stated as alternative requirements in *Zurcher v. Pa. P. U. C.*, 173 Pa. Superior Ct. 343, 98 A. 2d 218 (1953) ; *Garner v.*

*Pa. P. U. C.,* 177 Pa. Superior Ct. 439, 110 A. 2d 907 (1955) and *Kulp v. Pa. P. U. C.,* 153 Pa. Superior Ct. 379, 33 A. 2d 724 (1943).

Inadequacy of existing service is a factor indicating public necessity for the proposed service: *D. F. Bast, Inc. v. Pa. P. U. C.,* 397 Pa. 246, 250, 154 A. 2d 505, 508 (1959) ; *Motor Freight Express v. Pa. P. U. C.,* 180 Pa. Superior Ct. 622, 629, 121 A. 2d 617, 621 (1956). If it appears that the existing service is adequate, the certificate should not be granted: *Motor Freight Express v. Pa. P. U. C.,* supra. However, absolute necessity for the new service is not required, nor is it necessary that the proposed service be indispensable: *Modern Transfer Co. v. Pa. P. U. C.,* 182 Pa. Superior Ct. 110, 115, 125 A. 2d 463, 466 (1956).

The railroad contends that, because of the similarity of route and schedule and comparability of rates between the new bus route and its own rail service, it must be held that an invasion of its territory exists in this case. However, differences between the existing rail service and the proposed joint bus service appear in important respects.

In the first place, the routes are not the same. While the proposed route is adjacent to the railroad's main line stations at Ardmore and Narberth, it is at no point within a half mile of the Wynnewood Station, the intervening main line station between Ardmore and Narberth. From Narberth to central Philadelphia the proposed route is entirely different from that of the railroad's main line. It does not come within a half mile of the Merion or Overbrook Stations. It parallels the railroad's Manayunk line for about a half mile from Cynwyd Station to Bala Station, but at a distance from the railroad of about a half mile. It then turns at right angles and passes the Manayunk line at Bala Station. From Bala Station to central Philadelphia it follows an entirely different route from

either the main line or the Manayunk line until it approaches Market Street. While it passes within a few hundred feet of the railroad's Suburban Station, it goes to the east on Market Street for about a mile beyond the railroad terminal.

Secondly, the proposed route furnishes through service, not theretofore available, between the Main Line and the Bala Shopping Center and the business district along City Line and between the Main Line and the central Philadelphia area between City Hall and Fifth Street. It also stops at short intervals in contrast to the more widely separated railroad stations.

Under the circumstances, there was adequate evidence to justify the conclusion that the railroad did not furnish the type of service proposed by the applicants and that the proposed service was reasonably necessary for the convenience of the public.

The railroad also objects that there was no specific finding that the existing railroad service is either inconvenient as to schedule or station location, unsafe, too slow or expensive or otherwise inadequate. No attempt was made to show such inadequacies. However, since the evidence indicates that the proposed service is different from the railroad service, the failure of the commission to make a specific finding that the existing service is inadequate does not vitiate its order. In such case, considerations are important which do not exist when the applicant seeks authorization for service identical in type and route to that already existing: *Pottsville Union Traction Co. v. Public Service Commission,* 67 Pa. Superior Ct. 301 (1917) ; *Railway Express Agency v. Pa. P. U. C.,* 195 Pa. Superior Ct. 394, 171 A. 2d 860 (1961). In the first of these cases when the application of a bus company was opposed by a street railway company, the new service was authorized without any specific finding of the inadequacy of the street railway service. In the opinion of this court, it was said:

"The theory of the appellant is that as it is reasonably supplying the means of transportation between the points named that no other company or individual should be allowed to interfere or be permitted to enter into competition with it. We cannot hold the Public Service Commission to the rigid rule that if there be one carrier supplying service between certain points, and that service is ordinarily adequate, that it is obliged invariably to refuse a certificate to other applicants including those using other methods of carriage. Where a steam car line occupies a certain route and furnishes adequate service, we can readily conceive of situations where a paralleling trolley company should also be allowed to serve the public although it may take a part of the patronage from the steam road. The fact that light is already served to a town by a gas company would not of necessity prevent an electric light company from obtaining a certificate to enter such a place. From the testimony before us, it can fairly be taken that some persons prefer auto-bus service to trolley and that others by reason of its freedom of motion are better served by the former than the latter and that the busses to some degree at least relieve the congestion at 'rush' hours. As stated before we cannot establish a rigid standard for these cases. In some cases no doubt a refusal to allow auto-bus competition is proper depending upon existing conditions. Some leeway must be allowed to the commission for the exercise of the discretion which the legislature has put in its hands and each case must be decided on its particular facts. The primary object of the public service laws is not to establish a monopoly or to guarantee the security of investment in public service corporations but first and at all times in the just exercise of its powers to serve the interests of the public." *Pottsville Union Traction Co. v. Public Service Commission*, supra, at p. 303.

Upon the record before us we cannot condemn, as being without a substantial basis in the evidence, the commission's conclusion that the proposed joint service is not only "reasonably practical", but necessary or proper for the convenience of the public.

4. The railroad's chief complaint is that the commission should not have authorized joint operation without weighing its adverse effect upon the railroad as against its advantage to a relatively small segment of the public, and without considering the basic problem of metropolitan commuter service involved.

This court is aware of the railroad's problems and has asserted the commission's obligation to give them proper weight: *Reading Co. v. Pa. P. U. C.*, 191 Pa. Superior Ct. 635, 159 A. 2d 61 (1960); *Pennsylvania Railroad Co. v. Pa. P. U. C.*, 197 Pa. Superior Ct. 382, 178 A. 2d 856 (1962). However, as we stated in *Motor Freight Express v. Pa. P. U. C.*, 180 Pa. Superior Ct. 622, 630, 121 A. 2d 617, 621 (1956): "While economy and convenience of the carrier are matters which the Commission may consider, . . . the interest of the public, not the carrier, is of primary consideration". The question of the probable effect of the new service upon the existing services is primarily for the commission, and, so long as it has carefully considered and evaluated the evidence and the problem involved, its conclusion will not readily be overturned by the court. No carrier has the right to be guaranteed freedom from competition in the face of a need for additional service. The propriety of permitting competition is largely an administrative question to be determined by the commission in its discretion, depending upon the locality involved, the type of service and the particular circumstances of each case: *Reeder v. Pa. P. U. C.*, supra.

The commission stated that the railroad produced no factual or practical evidence that the new service will have an adverse effect upon it. The railroad's case

is based largely upon a series of exhibits produced by Mr. Patchell, its vice-president in charge of special services and concerned with passenger problems. Exhibits B to F reflect the result of tests as to the relative length of time it takes to reach 9th and Market Streets from various points on the Main Line between Ardmore and City Line, when using railroad, bus or private automobile. The railroad buttresses these tests by its Exhibit G, which is a graph purporting to show the effect of relative travel time upon the use of the various media. It is a compilation of many studies made in many metropolitan areas.

While these exhibits are enlightening to some extent, they suffer from the defects which commonly weaken the force of statistical studies of human behavior. The time studies cover only a relatively few instances of trips made by one or two persons, and consequently cannot allow for individual variations in physical health, mental outlook, or personal preferences and idiosyncrasies. While the graph is based upon a great number of individual instances, unfortunately the various compilations used in charting it are derived indiscriminately from varying metropolitan areas throughout the United States with varying traffic problems, and without regard to what competing kinds of transportation were involved. Mr. Patchell's testimony and these exhibits may lead to the conclusion that there will be some diversion of the railroad's midday passengers, but they give little indication as to how great that diversion will be or that it will be substantial. The commission acted within the ambit of its discretion in refusing to give this evidence the weight which the railroad claims for it.

The argument that the new service will injure the railroad is based upon (a) the fact that at three points the proposed route is adjacent to the railroad's stations and that it passes within a few hundred yards of its

Suburban Station in downtown Philadelphia; and (b) testimony that it would attract middle-of-the-day passengers, who are the most desirable segment of the railroad's suburban passenger traffic, and that it would not convert private automobile users into bus passengers but would be largely used by potential rail passengers. However, we do not agree that the commission abused its discretion in failing to find these considerations controlling.

(a) The routes are not parallel, as we have pointed out above, and the bus route taps an area which is, in large part, different from that served by the railroad, with certain exceptions in the vicinity of the Ardmore, Narberth and Bala Stations. The applicants presented an estimate that only 400 passengers daily out of 2400, or one-sixth of the total passengers expected to be carried by the buses, are persons who will ride from Montgomery County to central Philadelphia. Presumably only a fraction of the 400 would be drawn from the railroad's main line passengers or from persons who would formerly have used Bala or Cynwyd Stations. And only a fraction of this fraction would be middle-of-the-day passengers. The railroad did not attempt to contradict the applicant's estimate by anything other than the general opinion of its vice-president, and the commission had the right to accept it.

The railroad's exhibits are based upon the assumption that the buses will invade the railroad's territory within a half mile of its stations, but furnish no argument for the proposition that persons who live north or east of the bus line are being served to any substantial extent, or at all, by the railroad. While the population appears to be considerably denser on the railroad side of the bus route, the other side is a well populated area.

(b) Mr. Patchell expressed the opinion that the buses will not draw from the railroad's deficit-produc-

ing commuter traffic during peak hours, which they are not geared to handle, while, because their fares are lower than the railroad's regular fares, they will attract the middle of the day traffic which the railroad desires to retain and thus accentuate the peak and valley nature of the railroad's commuter service, deepening the valleys but leaving the peaks intact.

However, the fare differential in the middle of the day does not clearly appear. The railroad sells reduced rate round-trip thrift tickets on the main line for its middle-of-the-day passengers at a lower rate than the bus fare. It presented no figures as to the average railroad fare paid by midday users of the railroad or the percentage of such users who buy round-trip thrift tickets. Nor did the railroad produce other data to support Mr. Patchell's opinion that the off-hour railroad traffic offsets the deficit in the peak hour commuter operations of the railroad, or to buttress his opinion that most of the diversion will be middle-of-the-day passengers.

The railroad relies heavily upon the exhibits purporting to show that travel time from Lower Merion Township to points east of City Hall is much less by private automobile than the proposed bus schedule and argues that, in consequence, private automobile users will not be likely to become bus passengers. By contrast, other exhibits purport to show that the differential in time between railroad and bus is not so great as to prevent the diversion of rail traffic to the buses. The cross-examination of Mr. Patchell threw some doubt upon the value of these exhibits and the commission had the right to accept, instead, the applicants' estimate that only a small proportion of the patrons of the new route will be drawn from the railroad's off-hour passengers, especially since the bus fares are considerably higher than the railroad's thrift ticket fares, and no lower than these fares plus the cost of the ten cent

shuttle buses to and from the Suburban Station and Fifth or Ninth and Market Streets.

We cannot say that the commission's conclusion that there was no factual or practical evidence to indicate an adverse effect on the railroad constitutes an error of law or an arbitrary determination. Certainly, the evidence of an adverse effect upon the railroad is not so clear or of such substance as to require the commission to refuse the application in order to preserve proper railroad passenger service for the residents of the area.

The railroad finally complains that the commission does not discuss the urban transportation problem, the new route's effect upon this problem and its function in its solution, or the distinctive nature of the Philadelphia Main Line railroad service. As to these matters, the applications before us present a problem for the proper exercise of the commission's discretion as to what will best serve the public convenience. There was substantial evidence to justify its conclusion, and its failure to discuss all of the railroad's evidence does not mean that it ignored it.

The conservation of existing urban transportation is, as the railroad points out, a matter of primary importance to the Philadelphia metropolitan area. On the other hand, the extension of transportation facilities into more recently developed areas of the metropolis is also a matter of great moment. It is the commission's function to assess the relative weight of these considerations when they conflict.

The railroad points out that the unparalleled residential section on the Main Line was built up by its commuter service, and that this service should be preserved. But at some point in that area's growth it begins to require additional service. The fringes of the area, in particular, may be inadequately served. The periphery of the area which is adequately served by the

railroad is to be drawn by the commission. Again, whether a type of service not furnished by the railroad is so important to a community that it must be authorized even though it may have some adverse effect upon the railroad, is for the determination of the commission.

The delicate balancing of the interests involved is a function of the Public Utility Commission, whose discretion in such a matter should be overturned by us only in a clear case of abuse. We find no abuse when, as here, the utility of the proposed service appears clear and the evidence leaves in doubt the possibility of any substantial detriment to the railroad.

Order affirmed.