## BIDDEFORD AND SACO GAS COMPANY

### v.

## PORTLAND GAS LIGHT COMPANY.

Supreme Judicial Court of Maine.

Oct. 4, 1967.

Joseph E. Harvey, John J. Harvey, Biddeford, Edward N. Gadsby, Boston, Mass., William R. Connole, Washington, D. C., for Biddeford & Saco Gas Co.

Vincent L. McKusick, Gerald M. Amero, William S. Linnell, Franklin G. Hinckley, Caspar F. Cowan, Portland, Thomas Brosnan, Gallagher, Connor & Boland, Washington, D. C., for Portland Gas Light Co.

John G. Feehan, Augusta, for Public Utilities Commission.

George A. Wathen, Augusta, for Consumers.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, DUFRESNE and WEATHERBEE, JJ.

MARDEN, Justice.

On appeal by Biddeford and Saco Gas Company (Biddeford) from a majority decree of the Public Utilities Commission (Commission) consenting to Portland Gas Light Company's (Portland) furnishing and extending its distribution of natural gas throughout York County and the denial of Biddeford's petition for recognition of its alleged subsisting franchise and for cancellation of its authority granted by the Commission in 1960 to abandon gas distribution service.

The issues are framed by a petition on December 23, 1965, subsequently amended, by Portland for consent from the Commission to furnish and extend its services throughout York County. Biddeford was allowed to intervene in opposition to Portland's petition. On February 3, 1966 Biddeford filed a petition asking the Commission to recognize it as the holder of a subsisting franchise to distribute natural gas in York County and also asking an annulment of the Commission's order of July 14, 1960 by which Biddeford had been authorized to abandon manufactured gas distribution services in the cities of Biddleford and Saco. Biddeford's petition, for reasons discussed below, reserved the right to question the jurisdiction of the Commission in the premises. Portland, together with a subsidiary, Southern Maine Gas Company (Southern), later changing its name to Northern Utilities, Inc. (Northern), was allowed to intervene in opposition to the Biddeford petition.

Southern was organized under the general corporation law (13 M.R.S.A. §§ 71–79) January 20, 1966 with a purpose to manufacture and sell gas, both manufactured and natural, "in any city or town within the State of Maine." Southern's name was changed to Northern on April 29, 1966.

By agreement, the petitions were heard together and the record consolidated. The evidence presented by Portland was offered and received on behalf, also, of Northern.

After the close of the record, Portland filed a motion that the Commission note a merger of certain other corporations, including Northern and Lewiston Gas Light Company, into Portland, and the change of the name of Portland to Northern. This motion was opposed by Biddeford and is denied by this Court. The posture of Portland and Biddeford are considered as the companies existed when the proceedings were instituted and the record made.

Because, in discussing this case, there is a distinction between grants to a corporation created by special act of the Legislature and purposes declared in certificates of organization under the general corporation law, on the one hand, and consent, in appropriate cases, by the Commission for such corporations to exercise the grants

from the Legislature and their declared purposes, on the other, we shall discuss "grants" and "purposes" as "powers" and the Commission consent as "authority" to exercise the purposes and powers.

The postures respectively of Portland and Biddeford were as follows.

Portland Gas Light Company originated by special act of the Legislature (Chapter 288, P & S L 1849) for the "manufacture and distribution of gas for the purpose of lighting the City of Portland" and empowered to provide this service for a term of thirty years. By successive legislative actions [1] it was empowered from time to time to increase its capitalization, its period of franchise was extended without limit, its power of distribution extended to natural gas and its service area extended to the cities of South Portland, and Westbrook, and the towns of Cape Elizabeth, Scarborough, Gorham, Windham, Falmouth, Cumberland and Yarmouth all in Cumberland County. This was Portland's franchise stance as of December 23, 1965.

In the meantime and prior to December 31, 1965, by Commission approved financing Portland brought, at an aggregate cost of approximately two and one-half million dollars, natural gas to its franchise area by the acquisition of a gas transmission company which had brought the gas from Massachusetts into the Portsmouth, New Hampshire area, and by the construction of transmission lines across the New Hampshire-Maine border and thence to Portland. It had also procured an allotment of natural gas from the Federal Power Commission.

A predecessor to Biddeford was Saco and Biddeford Gas Light Company, established by Chapter 387, P & S L 1850, and empowered to manufacture and distribute gas "for the purpose of lighting the towns of Saco and Biddeford." By successive special enactments of the Legislature [2] creating new companies, authorizing such new companies to take over the previous ones and extending their powers, York County Power Company (York), created by Special Act in 1913, by October 28, 1914, had authority to deal in gas within the County of York.

Cumberland County Power and Light Company (Cumberland) was created by Special Act (Chapter 256, P & S L 1907) and empowered to deal in gas within the Counties of York and Cumberland, except the towns of Sanford and Bridgton, and to acquire the rights of other public service corporations doing business in York. Cumberland acquired the property and franchise of York on June 30, 1923.

Meantime Central Maine Power Company (Central Maine) created by Special Act (Chapter 129, P & S L 1905), primarily for the generation and distribution of electricity, had been granted broadened purposes [3] and by instrument of merger dated June 30, 1942 and approved by the Commission November 30, 1942, absorbed Cumberland.

In addition to the approval by the Commission, Chapter 56, § 63 R.S. 1930, now 13 M.R.S.A. § 247, provided that such merger gave the surviving constituent corporation the franchise rights of the corporation merged into it.

Biddeford originated under the general corporation law in April of 1949 for the purpose of dealing with "gas in any form * * * to public and private consumers in the cities of Biddeford and Saco and the

---

[1]. See the following Chapters all in Private and Special Laws, Chapter 203, 1854; Chapter 544, 1856; Chapter 7, 1887; Chapter 327, 1901; Chapter 385, 1905; Chapter 225, 1913; Chapter 84, 1925; Chapter 46, 1929; and Chapter 66, 1951.

[2]. See the following Chapters all in Private and Special Laws, Chapter 118,

1853; Chapter 213, 1891; and Chapter 224, 1913.

[3]. See the following Chapters all in Private and Special Laws, Chapter 104, 1907; Chapter 298, 1909; Chapter 288, 1911; and Chapter 184, 1913.

towns of Kennebunk, Kennebunkport, North Kennebunkport, Wells, Sanford, York, Kittery, Eliot and Old Orchard Beach in the County of York, and the town of Scarborough, County of Cumberland."

It is to be noted that the towns of Berwick, and North Berwick and South Berwick are not included.

By 35 M.R.S.A. § 2538 any company dealing in manufactured gas is empowered to deal in natural gas.

By joint petition of Central Maine and Biddeford, dated April 15, 1949 to Commission, Central Maine sought permission to transfer its gas properties and franchises, covering the municipalities named above, to Biddeford, which petition was granted by the Commission by final decree of April 25, 1949, and authority was granted Central Maine to sell and Biddeford to acquire gas business and franchises as requested.

Assuming, without finding, that Central Maine acquired special charter rights by absorbing Cumberland through a merger agreement and the application of 13 M.R.S.A. § 247, previously referred to, the relationship between Central Maine and Biddeford was not one of merger but of vendor-vendee.

Biddeford in fact from 1949 until July, 1960, manufactured and distributed gas in the cities of Biddeford and Saco. In 1960, having converted its users from manufactured gas to liquified petroleum (bottled gas), Biddeford sought and was granted, by the Commission, permission to abandon its manufactured gas business. It transferred its bottled gas business to an affiliate company, transferred its real estate to another affiliate, retaining its network of underground distribution pipes, and the "power" of its corporate purposes.

In 1957 Biddeford filed amendments to its certificate of organization to extend its powers to supply gas, manufactured, natural, or a combination of the two, anywhere within the State of Maine.

This was Biddeford's franchise stance as of February 3, 1966.

■ As against the legislatively granted powers and the corporate purposes declared in the respective certificates of organization stated above, the controversy among the parties is centered in applicable statutes. 35 M.R.S.A. § 294 in part [4] provides that:

"The commission may authorize any public utility organized by special Act of the Legislature to furnish or extend its service in, to or through any city or town notwithstanding any territorial limitations, express or implied, in the special Act of the Legislature by which it was organized, or in any special Act of the Legislature under which it is enfranchised, and the powers and limitations of the commission, made applicable hereunder, shall be those applicable by law in like cases concerning public utilities organized under Title 13, sections 71 to 79." (general corporation law)

It is to be noted that the word "authorize" as used here unquestionably refers to Commission granted "authority,"—Commission consent, in the sense which we ascribe to it earlier in the opinion.

Section 2301 provides:

"Corporations * * * for the purpose of making, generating, selling, distributing and supplying gas or electricity, * * *, for lighting, heating, manufacturing or mechanical purposes, in any city or town, or 2 or more adjoining cities or towns, within the State, or for either or any of such purposes, may be organized under Title 13, sections 71 to 79. (general corporation law) No corporation so organized * * * shall have authority, without the consent of the Public Utilities Commission, to furnish its service in or to any city or town in or to which another corporation, * * *

4. Added to Section 294 by Chapter 186 P.L. 1955.

is furnishing or is authorized to furnish a similar service."

■ The word "authorized" here and in Section 2302 below means "empowered" in the sense that we have used the term. Twin Village Water Company v. Damariscotta Gas Light Company, 98 Me. 325, 331, 56 A. 1112.

Section 2302 provides:

"No consent, authorized in section 2301, * * * shall be granted to any * * * corporation to operate, * * * any public utility of the kind named in section 2301 in any city or town where there is in operation a public utility engaged in similar service or authorized therefor, until the Public Utilities Commission has made a declaration, after a public hearing of all parties interested, that public convenience and necessity require such second public utility."

■ Portland, as a legislatively chartered corporation with franchise limited to Cumberland County, was required to invoke the provisions of § 294 for authority from (consent of) the Commission to extend its service into York County, with the concomitant burden "applicable * * * in like cases concerning public utilities" organized under the general corporation laws. This burden was to satisfy the Commission that "public convenience and necessity" required its service in York County. Portland adopted this course,—and although on appeal it urges its subsequent merger gave it specially chartered rights in York County, the alleged merger is not in the record and has no relevance. Portland is confined to the § 294 procedural approach.

■ Biddeford, as a public utility, was not furnishing natural gas to the area for and in which it was empowered,—to its erstwhile franchised area. Upon petition and with Commission consent it abandoned its public utility service in 1960. It contends, however, that it is entitled to priority in the distribution of gas within its former franchise area for two reasons. One, that although it was organized under the general law it has, by taking over legislatively chartered companies, "stepped into their shoes" as a legislatively chartered company and has preemptive rights under the ruling in Poland Telephone Company v. The Pine Tree Tel. & Tel. Co., Me., 218 A.2d 487, which rights the Commission has no jurisdiction to alter, and, two, that its purposes recited in its certificate of organization under the general corporation law empower it to distribute natural gas in the area into which Portland seeks to "extend," and that § 2302 protects that power until it be shown that it is not ready, able and willing to exercise it.

As bearing upon Biddeford's alleged priority under §§ 2301 and 2302 it must be noted that prior to the initiation of these proceedings, Southern also had been empowered under the general law to deal in gas in any place within the state. When Biddeford petitioned, Southern was empowered to furnish a similar service, in the same area.[5] Neither had subsisting authorization from the Commission.

Biddeford's contention that it became entitled to special charter protection derivatively is negatived by § 2301 which declares that no corporation organized under the general law may invade a municipality in which another corporation is empowered (as used in Twin Village, supra) to serve, without Commission consent.

Portland and Biddeford entered this controversy upon equal footing. Each had to secure Commission "consent" (authority), Portland by reason of §§ 294, 2301, and

---

5. The geographical areas sought by Portland, and claimed by Biddeford are not identical, but the differences are not controlling.

2302, and Biddeford by reason of §§ 2301 and 2302.

Biddeford does not specifically seek "consent." It seeks decretal recognition of its alleged right to serve the area and annulment of the 1960 decree consenting to its abandonment of public utility service.

The latter prayer in substance seeks Commission authority (consent) to again serve its area with distribution of gas.

 With this determination of the issue before the Commission and the voluminous record before us, the decrees are subject to review only on questions of law. 35 M.R.S.A. § 303. Whether findings of fact by the Commission are warranted by the law, is a question of law, Public Utilities Commission v. Cole's Express, 153 Me. 487, 492, 138 A.2d 466, but Commission factual finding, as basis for its decree, is final if supported by any substantial evidence. Public Utilities Commission v. Johnson Motor Transport, 147 Me. 138, 143, 84 A.2d 142. Additionally it has been pointed out that evaluating public needs in the utility field involve "questions peculiarly within the study, experience and good judgment of this commission, which was established by the Legislature to pass upon these kindred questions. The judgment of the court in such matters is not to be substituted for that of the commission." Public Utilities Commission v. City of Lewiston Water Commissioners, 123 Me. 389, 391, 123 A. 177. This court "cannot review the judgment of the commission as to public policy or the discretion vested in it" under the statute. In Re The Samoset Company, 125 Me. 141, 143, 131 A. 692, 693, and State v. Ballard, 152 Me. 158, 160, 125 A.2d 861, 862. With Biddeford's second prayer to annul the abandonment order, treated, as it must be treated, as a request for consent to return to public utility status "(t)he question of which of these petitioners could best serve the public in view of all the existing circumstances is a matter left by the Legislature to the sound judgment and discretion of the Public Utilities Commission. It is not a judicial question subject to review by the courts." Samoset, supra, 125 Me. at 144, 131 A. at 693.

The factual issue resolved by the Commission, from over 1000 pages of recorded testimony and over 180 exhibits, documentary and real, as to which of the competing companies measured by the rule of "public convenience and necessity," as used in the Maine Public Utility law, merited consent of and authority from the Commission to supply gas service to the reference area, is documented in its decree.

Numerous phases of the problem are covered by the record and explored by the Commission, including availability of gas expressed in the allotment and terms imposed by the Federal Power Commission, history of operation in Maine by the respective companies, ability to finance the proposed distribution system, the economics involved, municipal surveys, and whether or not the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79 to 79z–6, casts any shadow over the operation as proposed by Biddeford.

Without discounting the evidence on the phases reviewed above, one of Biddeford's urgent contentions was that its ownership of 146,300 feet of gas distribution mains in the ground, which system had been in use for a period up to 1960 in the distribution of manufactured gas, tipped the scales clearly in Biddeford's favor, prospective ratewise. It is urged that the cost to Biddeford,—and ultimate users, in renovating these existing lines by the introduction under pressure of a sealant, which would close minor sources of leakage, and effectively reconstitute the packed joints, was so competitively advantageous as against the installation of new lines required by Portland, that public interest could be served only by adopting the Biddeford plan. Conversely, the Commission was bound to

recognize that in the event the proposed renovation of the Biddeford lines were less than effective, safety factors considered, the ultimate cost occasioned by new lines following the attempted renovation would be greater than the installation of new lines in the first instance.

■ From this extensive record, with a mass of conflicting estimates, both engineering and economic, it cannot be illustrated that the Commission erred in its conclusion. We find no lack of substantial evidence to support the decree.

Appeal dismissed.