**Philp R. CUNNINGHAM**

v.

**Carrie E. CUNNINGHAM.**

Supreme Judicial Court of Maine.

Feb. 6, 1974.

Oscar Walker, Bangor, for plaintiff.

Hale & Hamlin by Charles J. Hurley, Ellsworth, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

In 1970 the Plaintiff son brought suit against the Defendant, his mother, seeking to obtain damages for breach of an alleged oral contract to devise land. By counterclaim the Defendant seeks a money judgment for the Plaintiff's occupation of the land without rent, for his sale of wood without an accounting of profits, and for his damaging of the homestead. The matter was assigned to a referee who heard the testimony but died before reaching a decision. By agreement of the parties, a new referee was appointed. The second referee, using the written transcript of the earlier hearing as testimony, filed his report in August, 1972. The referee found that the Defendant should have judgment on the Plaintiff's claim and that the Plaintiff should have judgment on the Defendant's counterclaim. A Justice of the Superior Court accepted this report and ordered these judgments, and from this final judgment the Plaintiff has appealed.[1] We deny the appeal.

---

1. While the Plaintiff in fact appealed from *all* of the Court's judgment, we assume that he did not intend to appeal from that part of the judgment which was entirely in his favor—that is, on the Defendant's counterclaim.

The land in question, which consists of a farm, lake shore and blueberry land, totalling about 180 acres, has been owned by the Defendant for many years and is located in Surry. The Plaintiff's complaint contends that in 1946 his mother orally promised to devise her land to him in return for his efforts in taking care of the property. The Defendant denies the existence of such an oral agreement and asserts that the only agreement between the parties took place in 1959 when she moved from the farm to Bangor. She states that under that 1959 oral agreement her son would care for the blueberry land and the parties would divide equally the net profits from the sale of the berries.

The Plaintiff worked on the Surry property from 1946, when he returned from military service, until 1970. From 1946 until 1952 the Plaintiff lived on the farm with the Defendant and the Plaintiff's sister. In 1952 he was married and went to live with his wife in Bucksport, but continued to work at the farm during the daytime. In 1959 the sister married and moved to Bangor, and the Defendant went there to live with her daughter. The Plaintiff and his wife moved onto the farm in 1958 and stayed there until 1970. In 1970 the Defendant asked the Plaintiff to pay her $800 annual rental, which he did that year. The Plaintiff now charges that this action by the Defendant broke the agreement of 1946.

The basis of the Plaintiff's complaint against his mother is his claimed existence of an oral promise by her to devise the farm to him in return for his working the land. We agree with the Plaintiff that if such a promise existed it was broken by her when she demanded that he lease the property from her in 1970.

As we enunciated in Brickley v. Leonard, 129 Me. 94, 97, 149 A. 833, 835 (1930), "[e]vidence to sustain an oral promise to make a will must be conclusive, definite, certain, and the contract must be established beyond all reasonable doubt." From our examination of the facts, we agree with the referee and the Justice that the Plaintiff has failed to sustain this heavy burden of persuasion.

The testimony is a mass of unclear assertions and denials. It is not disputed, however, that the Plaintiff made his home on the farm with his mother and sister from 1946 to 1952 and, with his wife, from 1958 to 1970. After the sister graduated from high school she worked in Ellsworth but continued to live at home, too, for ten years until her marriage. The Plaintiff performed work on the farm during the entire period from 1946 to 1970 but he was also employed in a Bucksport paper mill and his work on the farm occurred during his free hours. Although the parties speak of the property as a farm, the evidence does not disclose that any crop other than blueberries was cultivated and sold. Plaintiff cultivated and improved his mother's 80 acre blueberry lot and his own adjacent 50 acre lot. At least some of her money as well as his own went into the purchase of equipment which was used on both lots. He cut and sold or permitted to be cut pulpwood, spoolwood and Christmas trees for which he received nearly $10,000 since 1958. When the mother left the farm to live in Bangor with the newly married sister in 1959, she and Plaintiff agreed that he would continue to raise and harvest the blueberries and she would receive one half the profit from their sale. The Plaintiff cleared a shore front on Upper Toddy Pond, improved a beach area and built eight cottages there. His mother occupied one at times and he rented the others, receiving income from them of approximately $2,000 a year.

When the blueberry crop dwindled and failed to produce a profit in 1969, she demanded that he pay her $800 yearly rent for his occupancy of the property and he did so. She requested that he formally lease the property from her in December, 1969 and he refused and left the farm in 1970.

The Plaintiff claimed that he had paid most of the taxes or had given his mother the money with which to pay them. The mother said she had paid them with her own money, even after she had left the farm to live in Bangor.

The mother denied ever promising to will the house to the Plaintiff and described the family relationship in this manner:

"Q. Did you ever pay Philip for the work he had done on the farm all those years?

A. No, he lived there with us, and he considered it his home and so did I. I should think he would do his part. We did ours, and I think what he did was for his own home."

At about the time the Plaintiff and Defendant agreed to divide the profits from the blueberry crop, the Plaintiff's wife started to keep detailed accounts of items of income and expense in relation to the Plaintiff's use of the mother's property. However, these accounts commingled income and expense concerning Plaintiff's own property with that of his mother's.

Furthermore, any support these accounts could have given the Plaintiff's claim of extensive performance on his part in reliance upon her claimed oral promise to devise the farm has been diminished somewhat by the remarkable fact that they showed expenses of $107,842.63 and income of $57,842.63, leaving a balance due of exactly $50,000.00.

The daughter testified that she had heard no conversation between Plaintiff and Defendant as to any agreement concerning the land except the 1959 agreement as to the care of the blueberry land and division of the profits. Although Plaintiff insisted that the Defendant reiterated to him on many occasions [2] her promise to devise the land to him, he said the only time when another person was present during any reference by his mother to such an agreement was in 1946 when he was purchasing from a Mr. Church a tractor for use on the farm. Mr. Church testified that Plaintiff and Defendant came to his home sometime about 1947 and Plaintiff purchased from him a secondhand tractor with harrows and plows. The Defendant paid for this equipment with money which the witness said she had just withdrawn from the bank. Mr. Church remembers this reference to future ownership of the farm as being:

"She made the statement that in due time that this was all going to be Philip's." [3]

---

2. The Plaintiff described his mother's promises in language such as:
"The understanding was to stay there and work and take care of the farm, and when she was through with it, it was to be mine."

.    .    .    .    .

She promised me the land when she was done with it, that I was to have the land and the place when she was done with it. It was to go to me for the work I had done.

.    .    .    .    .

She said it was all willed to me and I didn't need any deed.

.    .    .    .    .

Q How did you happen to enter into the agreement? In other words, how did you happen to enter into it?
A It just started out clearing up the blueberry ground and working on the blueberry ground to get a living as much as working on the project.
Q Did she present the agreement to you, or did you present it to her, or just what were the circumstances?

A Well we had lived there and had worked on the farm, and she said, 'You work on the farm, and the farm will be yours, if you go ahead and take care of me and my sisters and brothers.'

.    .    .    .    .

[S]he said that I wouldn't need a deed because everything was willed to me, and I worked on from there.

.    .    .    .    .

Every time I wanted a deed or anything, she'd say, 'You ain't got to bother with it 'cause I've got it willed to you.' It was willed to me.

.    .    .    .    .

'[Y]ou don't have to worry. That is all willed to you. You don't have to worry about it.' "

3. In *Wilbur v. Toothaker*, 105 Me. 490, 75 A. 42 (1909), an action for specific performance of an oral land contract which requires clear and convincing proof, this Court had the

The referee found that the asserted oral agreement was accurately described by the Plaintiff on cross examination as follows:

"Q And what did your mother actually tell you in 1946? That she would do what for you? Tell me exactly what she told you?

A She told me that the place was mine on the will, and I asked her for a deed, and she said that I wouldn't need a deed because everything was willed to me, and I worked on from there.

Q And was this simply a word of mouth?

A Absolutely, word of mouth.

Q She never wrote you any letters or any memorandums or anything?

A No.

Q She simply said, 'I'm going to make a will and leave my property to you?'

A She said that everything was willed to me.

Q And this is simply a word of mouth, as you say?

A Yes. It absolutely was."

The referee then found

"[T]he facts establish a then intention on the part of the defendant to leave the farm to the plaintiff. The expectations created in the son were not, however, the equivalent of a promise by the mother to devise the property to him on performance of services by the son."

This he found did not establish the existence of the contract to devise which the Plaintiff alleged. He found that judgment should be entered for the Defendant on the

occasion to assess a similar witness' testimony. The opinion commented:

"Human memory is so treacherous that too much reliance cannot be placed upon the attempted recital, however honest, of a con-

Plaintiff's claim and for the Plaintiff on the counterclaim.

The plaintiff filed objections to the acceptance of the referee's report. The Justice in the Superior Court also reviewed the transcript, accepted the referee's report and ordered judgments as the referee had recommended. His action raises two important procedural questions not previously considered by this Court.

*The standard by which the Superior Court measures findings of fact by a referee who has heard no testimony.*

■ The Justice in the Superior Court who accepted the report of the referee held that the findings of fact of the referee were not *clearly erroneous.* Because of the unusual posture in which this case was presented to the Justice, his use of this familiar standard of review was misconceived. This is understandable in view of the absence of any interpretation from this Court of M.R.C.P., Rule 53(e)(2) as applied to findings of referees made entirely from examination of the printed record.

We said recently in Matthews v. R. T. Allen & Sons, Inc., Me., 266 A.2d 240, 244 (1970):

"The familiar rule that findings of fact will not be set aside if they are supported by competent evidence is based upon appreciation of the truth that the fact finder who hears and sees the witnesses, who observes their hesitations, inflections and emphases, is in a more favorable position to judge their credibility than the appellate court which only reads the printed testimony. Flagg v. Davis, 147 Me. 71, 83 A.2d 319 (1951); Young v. Witham, 75 Me. 536 (1884); Field, McKusick and Wroth, Maine Civil Practice, supra 52.8. M.R.C.P. Rule 52(a) expressly recognizes the trial court's advantages in judging the credibility of the witnesses.

versation that took place a quarter of a century ago between other parties and concerning a matter in which the witness had no special interest." 105 Me. at 491, 75 A. at 42.

However, the reason for the clearly erroneous rule disappears when the Commissioner, too, makes his decision from the printed record. The appellate court is then in an equally good position to find the facts and must do so uninfluenced by the findings of the Commissioner."

In *Matthews* we were speaking of the standard governing our own review of the findings of an Industrial Accident Commissioner which were based entirely upon written reports and records and the transcript of testimony taken before another Commissioner. In In re Edwards' Estate, 161 Me. 141, 149, 210 A.2d 17, 21 (1965) we applied the same standard to the review of the findings which a Judge of Probate had made from an agreed statement of facts. In Thacher Hotel, Inc. v. Economos, 160 Me. 22, 23, 197 A.2d 59, 60 (1964) we applied this rule to the findings of a Superior Court Justice who had heard no oral testimony. *See* Field, McKusick and Wroth, Maine Civil Practice § 52.8 (1970).

■■ By the same rationale we give a similar construction to M.R.C.P., Rule 53 (e)(2) which controls the acceptance of referee's reports by Justices in the Superior Court and provides that when the right to object to the acceptance of the referee's report has been reserved " . . . the court shall accept the referee's findings of fact unless clearly erroneous." In the rare situation where the referee bases his findings of fact entirely upon the printed record, the purpose of the application of the *clearly erroneous* rule disappears and the function of the Justice of the Superior Court is not to decide whether there was competent evidence to support the referee's findings (*i. e.*, the clearly erroneous rule) but whether the referee's evaluation of the evidence led him to an erroneous conclusion. The party who is objecting to the acceptance of the referee's report has the burden of proving error by the referee. If so, his findings of fact—like his conclusions of law (Bank of Maine v. Giguere, Me.,

309 A.2d 114 (1973))—may be set aside by the Justice.

However, while the Justice placed too restrictive a standard upon his right to reject the referee's findings of fact, it is clear from his language that he concluded not only that the referee was not *clearly* erroneous—he found that the referee was not erroneous at all. The Justice added: "Upon a review of the evidence, it appears that no other conclusion could reasonably have been reached."

■ We also review the same written record on appeal by the standard we accepted in *Matthews* and find no error in the conclusions of the referee and the Justice in the Superior Court.

Our own study of the transcript does not convince us that the referee was in error in finding that the Plaintiff had failed to prove an express promise to devise. The testimony is far from conclusive, definite and certain and cannot be considered to prove such a contract beyond a reasonable doubt. Brickley v. Leonard, supra.

*Validity of the action of the Justice who, after accepting the referee's report, proceeds to decide an issue not asserted in the complaint or considered by the referee.*

One more unusual aspect of this case remains for disposition.

The Justice noted that the referee had made no finding as to whether or not the evidence disclosed facts from which an agreement to devise the property to the plaintiff should be *implied*. The Justice then proceeded to examine the record for evidence bearing upon *that* question and found the evidence did not justify implying such a contract from the circumstances.

■ The Plaintiff had filed an "objection" to the acceptance of the referee's report (M.R.C.P., Rule 53(e)(2)) but the exact nature of his objections is not disclosed to us. This "objection" only refers the reader, for further information, to a

brief which was apparently filed with the document and which is, of course, not before us.[4] Apparently, however, the Justice's action in ruling upon the additional question resulted from an objection found only in the brief. Our own examination of Plaintiff's complaint satisfies us that it presented only the issue of the existence of an express contract to devise. No other issue than that submitted to him could have been determined by the referee. *See* Ford v. Inhabitants of Whitefield, 137 Me. 125, 15 A.2d 857 (1940). While the parties could have agreed to an amendment to the pleadings when the matter was returned to the Superior Court and to a submission of the additional issue of implied agreement to the Justice to be determined by him upon the transcript of the witnesses' testimony, along with the referee's findings as to the issue of express agreement, the record does not show that this was done.[5]

We think, therefore, that the Justice's finding that no agreement to devise should be implied from the circumstances must be treated as surplusage as it does not appear that the issue was before the Justice.

The entry will be:

Appeal denied.

All Justices concurring.

4. Prior to the adoption of our present rules, Rule XXI of the Supreme Judicial and Superior Courts had required that such objections "shall set forth specifically the grounds of the objections and these only shall be considered by the court." In Moores v. Inhabitants of Springfield, 144 Me. 54, 64 A.2d 569 (1949) we held that exceptions based upon general statements of objection could not be considered on appeal. *See also* Dubie v. Branz, 146 Me. 455, 73 A.2d 217 (1950).

While our present Rule 53(e)(2) states only that a party may "serve written objections thereto upon the other parties" it is elementary that the "other parties", the Superior Court Justice and this Court on appeal are entitled to specific statements of the objections.

5. M.R.C.P., Rule 53(e)(2) authorizes the Justice to adopt the report, modify it or to reject it in whole or in part. He may also recommit

it with instructions or he may "receive further evidence." The rule cannot, however, give the Justice jurisdiction over issues not presented by the complaint.

We have in mind that M.R.C.P., Rule 15(b) permits the amendment of a complaint after hearing to conform with the evidence. However, the application of this rule presupposes that the Justice permitting such an amendment was the tribunal to whom the disputed issue had been submitted for determination. As far as this record *discloses*, the only issue submitted to the Justice for determination was the acceptance of the referee's report. (While it seems likely that the Justice's action in ruling upon the undeclared claim was in response to a specific objection to the referee's report, suggesting in turn a submission to the Justice of an issue to be treated as added by amendment to conform with the evidence, we do not feel entitled to draw such conclusions from the record.)