**In re Andre LEFEBVRE d/b/a Merchants Express.**

Supreme Judicial Court of Maine.

Aug. 20, 1975.

Pierce, Atwood, Scribner, Allen & Mc-Kusick, by Vincent L. McKusick, Everett P. Ingalls, III, Portland, for appellant.

Preti & Flaherty, by David M. Cohen, John J. Flaherty, Portland, for appellee.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

ARCHIBALD, Justice.

Appellee, Merchants Express (Merchants), pursuant to 35 M.R.S.A. § 1552, applied to the Maine Public Utilities Commission requesting an amendment to its permit which would extend its service from Biddeford to the Sanford-Springvale area, including the right to serve the intermediate towns from Route 111.[1] Appellee's existing certificate allows it to operate as a common carrier between Portland-South Portland and Biddeford, including the various intermediate points.[2]

Congdon Transportation and Sanborn's Motor Express, Inc., (Sanborn) both were allowed to intervene.[3] The intervenors already provide common carrier freight service to the points sought to be served additionally by Merchants.

Hearings were held in May, 1973, at which time Merchants introduced the testimony of both wholesalers and retailers tending to prove a need for "same-day" and Saturday service,[4] a type of service not generally available. The testimony in opposition sought to prove that there was an inadequate demand for common carrier service over the proposed route and, therefore, the proposed new type of service would not be economically profitable.[5] The examiner who heard this testimony died on September 24, 1973, nearly two months before the Commission issued its decree granting the proposed enlargement of Merchants' permit.

The Commission found that public convenience and necessity would be served by granting the application in view of the fact (1) that retailers in the Sanford-Springvale area often were disadvantaged in obtaining urgently needed merchandise by the lack of faster delivery service, (2) Maine wholesalers were likewise disadvantaged in competing with New Hampshire dealers who did have access to "same-day" service, and (3) the delivery of items requiring refrigeration would be enhanced by this type of service.

The Commission then considered the existing service and found it inadequate in several respects. First, Sanborn did not offer "same-day" or Saturday service, inferring that, despite demand, it would not voluntarily do so. Secondly, Sanborn's over-night service was found to be slow, since freight picked up on one day was frequently not delivered until late the fol-

---

1. These include the towns of Arundel, Lyman and Alfred.

2. These points are Cash Corner, Thornton Heights, Oak Hill, Scarborough, Dunston, Pine Point, Old Orchard and Saco.

3. Sanborn had pending at all relevant times an application to purchase the operating rights of Congdon.

4. Merchants proposed to give "same-day" service on freight picked up in Portland by 12:00 o'clock noon and will deliver freight picked up on a given afternoon by the following forenoon.

5. Sanborn had evidence that a previous carrier offering the proposed service between these same points had become insolvent.

lowing day, while the proposed service of Merchants would expedite over-night deliveries. Thirdly, the Commission found that Sanborn had missed pickups in "a few instances." Finally, the Commission was not persuaded by Sanborn that there would be insufficient traffic generated by the new service to make the route financially profitable.

Sanborn petitioned for a reconsideration of the decree, which was granted and a hearing was held on December 27, 1973. Reconsideration was sought on the ground that the Commission had not taken the energy shortage into consideration when determining the needs and convenience of the public and the applicant's ability to furnish such service. In its supplemental decree of February 14, 1974, the Commission indicated that "such matters would be more properly the subject of a general investigation," that it did not have the "input we would feel essential to a thorough evaluation of these questions" and refused to reconsider the earlier decree.

Appellant asserts the following claims of error:

(1) There was insufficient evidence to uphold the Commission's decree granting "same-day" and Saturday service.

(2) The Commission erred as a matter of law in granting authority to the applicant allowing it to render service from the points it is already authorized to serve and the intermediate points along Route 111 because there was no substantial evidence in the record to indicate a need between such points.

(3) It was error not to restrict the permit to the rendering of "same-day" and Saturday service only because the evidence introduced referred solely to the need for such types of service.

(4) The refusal by the Commission to consider the fuel shortage on rehearing was error as a matter of law.

We deny the appeal.

Before we can reach the appellant's claims of error we must delineate the scope of appellate review. Appellant admits that the Law Court's normal scope of review involving factual findings is limited to a determination of whether there was substantial evidence in the record to uphold the Commission's decree. *In Re United Parcel Service, Inc.,* 256 A.2d 443 (Me. 1969); *Public Utilities Com'n v. Johnson Motor Transport,* 147 Me. 138, 84 A.2d 142 (1951). However, it claims that the death of the hearing examiner before the decree was rendered allows this Court to assess the evidence on a "de novo" basis since the Commission must have made its decision based solely on a printed record. We do not find this argument persuasive.

Appellant attempts to draw an analogy between this factual background and that existing in *Matthews v. R. T. Allen & Sons, Inc.,* 266 A.2d 240, 244 (Me.1970), when an Industrial Accident Commissioner had made a decision based on a printed record only, the Court holding:

> "The appellate court is then in an equally good position to find the facts and must do so uninfluenced by the findings of the Commissioner."

Likewise analogous, it is argued, is *Cunningham v. Cunningham,* 314 A.2d 834 (Me.1974), a case in which the originally appointed referee died after the testimonial record was completed, and the case was submitted on that record to a successor referee. In *Cunningham* "because of the unusual posture" of the case before the Law Court, we held that *under those facts* the clearly erroneous rule was not the test applicable to appellate review, citing *Matthews.*

We do not agree with the premise of appellant's argument, namely, a legal similarity exists between the Industrial Accident Commission, court-appointed referees and examiners appointed by the Public Utilities Commission. The critical distinction between *Matthews* and *Cunningham* and the

suggested analogy is found in 35 M.R.S.A. § 299 which provides:

"Said [Public Utilities] commission shall have power to appoint, to serve during its pleasure, examiners, who, being first duly sworn, shall have authority to administer oaths, examine witnesses, issue subpoenas, require the production of books, accounts, papers, documents and testimony, and receive evidence in any matter under the jurisdiction of the commission, and shall perform such other duties as may be assigned to them. Evidence so taken and received shall have the same force and effect as though taken and received by said commission and shall authorize action by said commission as though by it taken and received. . . ."

Notably absent from Section 299 is any delegation of decisional power to the examiner on either facts or law. He has no authority beyond that of receiving proper evidence so that a record may be made upon which the Commission, *and it alone,* may reach a decision, using this record "as though by it taken and received." Thus, unlike Industrial Accident Commissioners or court referees, an examiner appointed under Section 299 performs limited procedural duties, the ultimate factual and legal conclusions being the exclusive prerogative of the Commission. The legislature intended this result or it would have provided otherwise.

While we do not doubt that the Commission may, if it wishes, consult with an examiner prior to making a decision, such consultation is not mandated by the statute. In the four months that intervened between making the record and the examiner's death, the Commission may have, or it may not have, discussed the facts with the examiner. The record is silent thereon. If the appellant was *in fact* prejudiced by the intervening death of the examiner, it has made no showing beyond advancing this purely theoretical argument.

We revert, therefore, to the well established doctrine expressed in *Biddeford and Saco Gas Co. v. Portland Gas Light Co.,* 233 A.2d 730, 736 (Me.1967):

"[E]valuating public needs in the utility field involve 'questions peculiarly within the study, experience and good judgment of this commission, which was established by the Legislature to pass upon these kindred questions. The judgment of the court in such matters is not to be substituted for that of the commission.'"

*See Dickinson v. Maine Public Service Company,* 244 A.2d 549 (Me.1968).

We now turn to the legal issues.

■■■ It is well settled that the Commission can issue a certificate granting additional authority to a common carrier only if the "public necessity and convenience require" it,[6] the burden always being on an applicant to so demonstrate. Public Utilities Commission of Maine, Rules of Practice and Procedure, Rules 15.1, 15.2; 35 M.R.S.A. § 3; *Application of Bangor and Aroostook Railroad Co.,* 157 Me. 213, 170 A.2d 699 (1961). "Convenience and necessity" relate to the general public, not to just a group of individuals. *In Re Stanley,* 133 Me. 91, 174 A. 93 (1934); *Merrill v. Maine Public Utilities Commission,* 154 Me. 38, 141 A.2d 434 (1958).

■■■ We find no legal error in the conclusion that there would be sufficient traffic in the extended route to justify two carriers. The Commission may permit competition, having broad discretion when deciding to what extent competition is needed and its probable effect on existing carriers. *Pennsylvania R. Co. v. Pennsylvania Pub. Util. Com'n,* 199 Pa.Super. 158, 184 A.2d 111 (1962); *Reeder v. Pennsylvania Public Utility Commission,* 192 Pa. Super. 298, 162 A.2d 231 (1960). We can

6. 35 M.R.S.A. § 1552.

detect no abuse of that discretion here. The appellant admitted that the route now generates approximately $20,000.00 in annual revenue and the applicant, in turn, testified that he would only require an income of $10,000.00 to make the expanded operation economical. Also, many of the witnesses testified that they would utilize a common carrier more frequently if "same-day" and Saturday service were available.

■ There was substantial evidence to support the finding that Sanborn had notice of the public's need for additional service. Several witnesses testified that they had complained to Sanborn's sales representative concerning the slowness of the over-night service and the need for "same-day" and Saturday service.

■ The Commission did not err in granting Merchants authority to render service from the points already served by it to the intermediate points between Biddeford and Sanford.[7] The applicant need only demonstrate public necessity and convenience in the general area, not as to every point in that area. *In Re United Parcel Service, Inc.,* 256 A.2d 443 (Me. 1969); *Noerr Motor Freight v. Pennsylvania Pub. Util. Com'n,* 181 Pa.Super. 322, 124 A.2d 393 (1956); *Reeder v. Pennsylvania Public Utility Commission,* 192 Pa. Super. 298, 162 A.2d 231 (1960).

The Commission, having a particular expertise in evaluating public convenience and necessity, certainly would be in a position to draw an inference that if the need for common carrier service existed between the termini of an authorized route, such need would likewise exist between intervening points. On the facts presented, the Commission had already ruled that carrier service between the intervening points of the original permit was appropriate and, having found that the certificate should be extended to include Sanford-Springvale because the need therefor existed, the Commission clearly acted within its discretion in including the three towns abutting Route 111 between Biddeford and Sanford. The Commission was obviously aware that Merchants, in servicing Sanford, would have to pass the points in dispute (Arundel, Lyman and Alfred) and with little additional cost it could furnish more service at less average cost and still accommodate the public. To promote such economies is one of the duties of the Commission. *Garner v. Pennsylvania Public Utility Commission,* 177 Pa.Super. 439, 110 A.2d 907 (1955).

Additionally, we construe this argument as having "make-weight" characteristics. Service to the three towns between Biddeford and Sanford-Springvale carried a definite limitation, namely, "to be served over Maine State Highway Route 111." We can assume the Commission was aware of the population density abutting Route 111 and the consequent minimal amount of common carrier business capable of generation along this rural road. Furthermore, such businesses abutting Route 111 that might need carrier service would find their natural major sources of supply, or outlet, in either Biddeford-Saco or 'Sanford-Springvale and it would seem patently irrational that the applicant should not be allowed to render common carrier service to them. Unlike the original permit authorizing service *anywhere* within the areas specified, the service to Arundel, Lyman and Alfred does not allow any deviation from Route 111.[8]

We find no merit in this argument.

Was it legal error to refuse to restrict the certificate to "same-day" and Saturday service only?

7. See footnotes 1 and 2, *supra.*

8. For example, if supplies were consigned for delivery at the York County Courthouse in Alfred, applicant could not accept the shipment because that structure, although within a few rods of Route 111, does not abut the highway.

■ Once inadequacy of existing service is determined the Commission may, in its discretion, authorize competition and need not limit the new carrier to providing service restricted to areas of specific demonstrated inadequacy. *Noerr Motor Freight v. Pennsylvania Pub. Util. Com'n, supra.* The Commission has broad discretion in deciding to what extent competition would serve the public interest. *Reeder v. Pennsylvania Public Utility Commission, supra.*

■ We note, again, that there was a factual basis for the Commission's finding that Sanborn's over-night service was inadequate. Delivery of consigned shipments were sometimes deferred until late in the afternoon of the day following their receipt. Merchants proposed to deliver such consignments by the following forenoon. Thus, a reason existed which justified the Commission in not restricting the certificate to "same-day" and Saturday service only.

■ Sanborn argues, however, that applicant's attorney limited the issue to the need for "same-day" and Saturday service by his concessions made during the hearing. We disagree. There was considerable evidence introduced concerning the inadequacy of the appellant's over-night service. The Commission is obligated to decide all issues raised by the evidence, and it did so properly. *See Dubois v. Maine Employment Security Commission,* 150 Me. 494, 114 A.2d 359 (1955).

■ We do not deem the Commission's refusal to consider the impact of the energy shortage as an abuse of discretion.

We quote the ruling:

"We have also reflected on the matters raised by Counsel for Sanborn's Motor Express, Inc. and Congdon Transportation relating to the availability of fuel which presently face this country. These matters are indeed important. We believe, however, that such matters would be more properly the subject of a general investigation. We do not have the input we would feel essential to a thorough evaluation of these questions in the record before us. Furthermore, in fairness to Merchants, we cannot arrive at the conclusion that further action on this application, filed nearly a year ago, should be delayed until such a general investigation is completed."

At the time this issue was raised, the dimension of the fuel shortage was unclear and subject to much public debate. The scope of the debate was international. To relate the impact of such a complex problem to this relatively short extension of an applicant's route would require extreme exactitudes of proof. We believe the Commission exercised sound reasoning in refusing to re-open the case for this purpose.

The entry is:

Appeal denied.

All Justices concurring.