**In re UNITED PARCEL SERVICE, INC. (Application for Common Carrier Authority).**

Supreme Judicial Court of Maine.

Aug. 7, 1969.

Vincent L McKusick, Gerald M. Amero, Portland, Me., George P. Williams, III, Philadelphia, Pa., for plaintiff.

Frank E. Southard, Augusta, Me., and Raymond E. Jensen, Portland, Me., for Common Carriers.

Horace S. Libby, Augusta, Me., for P. U.C.

Before WEBBER, MARDEN, DU-FRESNE, and WETHERBEE, JJ.

WEBBER, Justice.

United Parcel Service, Inc., (U.P.S.) a corporation engaged in the transportation both interstate and intrastate of items of limited size and weight, applied to the Public Utilities Commission for authority to conduct its business in Maine. Certain motor common carriers (truckers) intervened in opposition to the request and are here appellants from the decree of the Commission granting the application.

The application requests operating authority as a common carrier to transport packages or articles between points in Maine, subject to the following restrictions:

"(1) No service shall be rendered in the transportation of any package or article weighing more than 50 pounds or exceeding 108 inches in length and girth combined, and each package or article shall be considered as a separate and distinct shipment.

(2) No service shall be provided in the transportation of packages or articles weighing in the aggregate more than 100 pounds from one consignor at one location, to one consignee at one location on any one day."

The Commission accurately described the nature of the service which U.P.S. intends to perform as follows:

"It appears the Applicant proposes a single line small package transportation service throughout the State of Maine, designed principally for commercial shippers, wholesalers, manufacturers, and jobbers whose personal delivery needs are not fully met by the United States Parcel Post Service. To accomplish this service, it will divide the State geographically into six operating areas. * * * At Portland, Auburn, Waterville, Bangor, Mattawamkeag, and Presque Isle, each point within a different operating area, so-called operating centers are to be established. In addition to these centers, a central sorting hub, its function to assist in the movement of packages between operating areas, is to be located in Bangor. The service will be offered based on this operating area concept, the mechanics of which are described as follows. When a package is destined to a point in the same operating area as its point of origin, it will move from the point of origin to the area operating center where it is transferred to a vehicle for delivery, which is accomplished the next day. When a package is destined to a point in an operating area other than the one in which it had its point of origin, it is transported first from the point of pickup to the area operating center, thence to the central sorting hub. A sort of all packages occurs. On completion of the sort, the package is placed on a vehicle for transportation to the operating center in which its point of destination is located. Thereat, it again is transferred to a vehicle which will accomplish delivery. In some cases, Applicant's Exhibit No. 29 points out packages may move directly between operating centers or via more than one central sorting hub.

This service will be available to all desiring to use it. It matters not whether the shipper or consignee is located in a

small city, town, village, hamlet, other type community, or outside a populated area. Pickups and deliveries will be made at their premises at any address in the State. Likewise, the volume shipped or business size is of no consequence. For a weekly charge of $2.00, daily pickup calls will be made notwithstanding the fact there may be few or no parcels to be shipped.

All packages sent one day by one shipper will be receipted for on one shipping document. Packages are picked up inside the shipper's premises and will be delivered directly to the consignee, whether in an office building, basement, or other location without regard to distance from sidewalk, platform, or carrier vehicle. If for any reason delivery cannot be completed on the first attempt, second and, if necessary, third attempts to deliver the merchandise will be made automatically and without extra charge. If delivery cannot be accomplished because of an incorrect address, reasonable effort to secure the correct address will be made in order to complete the delivery. The shipper will be notified of any correction in the address. On the shipper's order a package previously delivered will be picked up from the consignee and returned.

Other important features of the proposed service include neat appearing drivers and vehicles; automatic insurance protection against loss or damage to $100.00 per package with additional coverage available for an additional charge; prompt remittance to the shipper of cash collections or checks for C.O.D.'s; adequate facilities to enable prompt answer to inquiries concerning dispositions of parcels; and rates for the service that make it a practical alternative to United States Parcel Post."

The Truckers have designated 22 points of appeal which will be considered in the numerical order in which they are presented. We have restated the points in the form of questions.

1. Did the Commission err in ruling that Applicant's proposed operation was as a common carrier over regular routes under 35 M.R.S.A., Sec. 1552.

We look first to the wording of the pertinent provisions of the statute. 35 M.R.S. A. Sec. 1552 provides in part:

"No person, corporation * * * or other transportation company shall operate, or cause to be operated any motor vehicle * * * upon any public way in the business of transporting freight or merchandise for hire as a common carrier over regular routes * * * between points within this State without having obtained from the commission a certificate declaring that public necessity and convenience require and permit such operation. The commission shall have authority and jurisdiction to determine applications for such certificates. The words 'regular routes' as used in this chapter mean those routes over which any person, firm or corporation is usually or ordinarily operating, or causing to be operated, any motor vehicle or vehicles, even though there may be departures from said routes, whether such departure be periodic or irregular. Whether or not the operation is over regular routes within the meaning of said chapter shall be a question of fact to be determined by the commission, the Supreme Judicial Court, the Superior Court or the District Court. * * * In determining whether or not such a certificate shall be granted, the commission shall take into consideration the existing transportation facilities and the effect upon them, the public need for the service the applicant proposes to render, the ability of the applicant efficiently to perform the service for which authority is requested, conditions of and effect upon the highways involved and the safety of the public using such highways. No such certificate shall be issued unless

and until the applicant has established to the satisfaction of the commission that there exists a public necessity for such additional service and that public convenience will be promoted thereby."

Our statutes nowhere define the term "common carrier" and we must look to the common law for clarifying definition. In P.U.C. v. Johnson Motor Transport, (1951) 147 Me. 138, 145, 84 A.2d 142, 146, it was stated, "A common carrier is one who holds himself out as engaged in the public service of carrying goods for hire, *to the limit of capacity, and to 'take anybody's freight.'* * * * Even a common carrier may become a private contract carrier by special engagement to carry *what is not its duty to carry."* (Emphasis ours.) The supporting citation directs attention to the texts in Am.Jur. and C.J.S. In updated form we find the following: "A common carrier has the right to determine what particular line of business he will follow, and his obligation to carry is coextensive with, and limited by, *his holding out as to the subjects of carriage.* Thus, it is not essential to the status of one as a common carrier that he carry all kinds of property offered to him. If he holds himself out as a carrier of a particular kind of freight generally, prepared for carriage in a particular way, he will be bound to carry *only to the extent and in the manner proposed."* (Emphasis ours.) 13 Am.Jur.2d 563, Carriers, Sec. 4.

We do not think, for example, that it is or could be seriously argued that a highway freight carrier would jeopardize its common carrier standing merely because it did not hold itself out to handle and could not in fact handle petroleum products, articles requiring refrigeration or heavy machinery. The Commission properly concluded that U.P.S. in accepting all proffered freight within the proposed maximum limits of weight and size would be conforming to the requirement that it "take anybody's freight"—"to the limit of capacity." Indeed, the statute (Sec. 1552) by its use of the phrase, "or to issue it for the partial exercise only of the privilege sought," contemplates that the Commission may restrict the service to be offered by the common carrier whenever it appears that public convenience and necessity so require.

The Truckers contend that U.P.S. is not offering common carrier service to the general public since its daily pickup service will be available only to those who pay $2.00 a week therefor. U.P.S. is offering a readily computable transportation tariff based upon the weight and destination of the shipment. The package and poundage charges are uniform for all shippers with no variation based upon the number of shipments made by the shipper. In addition U.P.S. offers to all shippers an optional service. For a weekly charge of $2.00, U.P.S. will make an automatic daily stop at the shipper's premises to determine whether or not he desires to send out any packages on that day. This is in the nature of a readiness-to-serve or standby charge. It makes available to the user at his place of business all of the transportation services of U.P.S. if they may be required. A shipper who purchases this service is entitled to this assured daily stop without the necessity of calling the carrier to request a pickup, and regardless of the frequency or volume of his shipments and even if he has no shipments during an entire week. The service charge is identical for all shippers without regard to the number of shipments they make. The charge is precisely the same whether one package is shipped, or many, or even if as might frequently happen, there is none to be sent on a particular day. On the other hand, a shipper who finds no need of the standby service and prefers to avoid the expense thereof does not thereby forfeit the benefits of all other features of U.P.S. service. He would as a matter of preference deliver his shipments to the carrier at one of its six operating centers after which the shipment would be transported in the same

manner and at the same rate as all other shipments.

The principle of a standby charge is that it compensates a public service company for holding itself in constant readiness to render service, whether or not any service is ultimately required and regardless of the volume of service rendered to any user. This fixed fee for "the convenience" of the daily pickup was specifically approved as compensatory and non-discriminatory in State ex rel. Railway Express Agency, Inc. v. Washington Public Service Com'n., (1960) 57 Wash.2d 32, 39, 354 P.2d 711, 715. We are satisfied that the Commission could properly determine that the imposition of the charge for this optional service would in no way prevent U.P.S. from being accorded standing as a common carrier.

The Commission determined that the proposed service would be that of a "common carrier over regular routes" within the meaning of 35 M.R.S.A., Sec. 1552. U.P.S. will provide daily intrastate service over some 124 regular routes which in actuality comprise practically all the highways in Maine, or in the words of the Commission "includes nearly all major routes and nearly all major points in the State." The above quoted statute provides in this connection:

> "The words 'regular routes' as used in this chapter mean those routes over which any person, firm or corporation is *usually or ordinarily operating,* or causing to be operated, any motor vehicle or vehicles, *even though there may be departures from said routes, whether such departure be periodic or irregular.* Whether or not the operation is over regular routes within the meaning of said chapter shall be *a question of fact to be determined by the commission,* the Supreme Judicial Court, the Superior Court or the District Court." (Emphasis ours.)

█ █ The evidence supports and indeed compels the Commission's finding that U.

P.S. will be providing regular service to the points on regular routes with off route departures on demand. As already noted, such "periodic or irregular" departures on the part of regular route common carriers are expressly provided for by statute. The Commission's determination that the proposed operation constitutes regular route common carriage rests upon the wording of the Maine Statute and is not affected or governed by any Federal statute or regulation. The rule announced in P.U.C. v. Johnson Motor Trans., supra, forbidding the commingling of interstate contract carrier service and intrastate common carrier service has no application here since no contract carrier service is involved. There is no bar to commingling identical services which when performed intrastate are properly denominated "regular route" common carrier services but which, when performed interstate, are by force of the regulatory definitions of the Interstate Commerce Commission classified by that body as "irregular route" common carrier services.

2. Did the Commission err in ruling that the statutes provide for a statewide authority as a common carrier?

█ It suffices to say that the Commission did not grant its authority in those terms. The Commission authorized transportation service, restricted as aforesaid, "between points in Maine over the following specified routes passing through and serving all intermediate points as well as service on demand to off route points." Then followed the listing of the routes with points of termini. The mere fact that the Commission has thereby authorized U.P.S. to offer its unique service to nearly all of territorial Maine does not in and of itself mean that the Commission has exceeded its statutory authority.

3. Did the Commission err in authorizing applicant to serve points in Maine as a common carrier over regular routes which points are to be served on demand as de-

partures from specified routes on an irregular basis?

This point has been covered by the discussion of the previous points of appeal.

4. Did the Commission err in ruling that evidence of the volume and nature of applicant's experience in providing service in other geographical areas was admissible?

█ The evidence was admissible as bearing on the fitness of the applicant to perform the proposed operations. The statute requires that the Commission take into consideration "the ability of the applicant efficiently to perform the service for which authority is requested."

5. Did the Commission err in ruling that evidence of the volume and nature of applicant's service in interstate commerce was admissible?

This point is fully covered by our discussion of Point # 4.

6. Did the Commission err in ruling that applicant's documentation procedure is consistent with Rules 14 and 15 of General Order No. 25 of the Public Utilities Commission in all important respects?

█ U.P.S. employs a simplified documentary procedure which is without doubt designed to make it fully competitive with United States parcel post. The procedure departs in a number of respects from the technical requirements of Rules 14 and 15. The Commission found in these terms: "We have compared this method (U.P.S.) with our Rules 14 and 15, and believe it is consistent therewith in all important respects." The Commission promulgated the rules and is the best judge of the objectives it sought to attain thereby. We see no occasion for substituting our judgment for that of the Commission in determining whether the documentary procedure proposed, having in mind the unique features and purpose of U.P.S. service, satisfies the purpose of the Rules "in all important respects." Moreover, we fail to see how the

Truckers are prejudiced by this ruling. If in fact they desire modifications of the Rules as applicable to their own operations, we cannot assume that the Commission will not entertain and consider appropriate proposals to achieve that result.

7. Did the Commission err in granting applicant a waiver of said Rules 14 and 15 in a proceeding for operating authority?

Having made the determination discussed above under Point #6, the Commission added: "To the extent it (the proposed documentation) is inconsistent, however, the Applicant has requested a waiver of the rules. We herein grant this waiver, but on the condition that Applicant's documentation procedure, as described in the record, shall not be changed, altered, or revised in any manner without notice to and the consent of this Commission." This ruling was incorporated in Paragraph 3 of the Commission's order. It suffices to say that in promulgating these rules by General Order No. 25, the Commission appropriately avoided an inflexible position on technical requirements by expressly reserving the right to modify, alter or amend by subsequent order "whenever such action may be deemed necessary or expedient." We think that it is highly desirable that the Commission should be able to deal with the practical necessities of particular situations on a case by case basis and that the language of the reserved power should be broadly construed so as to permit a waiver ordered by the Commission for good cause. Moreover, as noted above, we are not satisfied that the Truckers show how they are prejudiced by the Commission's approval of the U.P.S. documentation.

8. Did the Commission err in ruling that the transportation services proposed by applicant are not now available to Maine intrastate shippers and consignees?

Consideration of this question can be appropriately joined with consideration of Points #9 to #13 inclusive as follows:

9. Did the Commission err in ruling that applicant's proposed service was of a

**450**

different nature from that of common carriers?

10. Did the Commission err in finding existing common carrier service to be inadequate in respect to any of the authority granted?

11. Did the Commission err in finding that grant of proposed authority will not result in serious loss of traffic to Protestants?

12. Did the Commission err in finding that the authorization of the service proposed will have no significant adverse effect upon existing authorized carriers?

13. Did the Commission err in finding that public convenience and necessity require the proposed operation?

 At the outset we are mindful that the judgment of the Court is not to be substituted for the judgment of the Commission on the issue of public convenience and necessity. The scope of judicial review where this issue is presented was summarized in the recent case of Biddeford and Saco Gas Co. v. Portland Gas Light Co., (Me., 1967) 233 A.2d 730, 736 in these terms:

"Whether findings of fact by the Commission are warranted by the law, is a question of law. Public Utilities Commission v. Cole's Express, 153 Me. 487, 492, 138 A.2d 466, but Commission factual finding, as basis for its decree, is final if supported by any substantial evidence. Public Utilities Commission v. Johnson Motor Transport, 147 Me. 138, 143, 84 A.2d 142. Additionally it has been pointed out that evaluating public needs in the utility field involve 'questions peculiarly within the study, experience and good judgment of this commission, which was established by the Legislature to pass upon these kindred questions. The judgment of the court in such matters is not to be substituted for that of the commission.' Public Utilities Commission v. City of Lewiston Water Commissioners, 123 Me. 389, 391, 123 A. 177. This court 'cannot review the judgment of the commission as to public policy or the discretion vested in it' under the statute. In Re The Samoset Company, 125 Me. 141, 143, 131 A. 692, 693, and State v. Ballard, 152 Me. 158, 160, 125 A.2d 861, 862."

 Abundant evidence supported the conclusions reached by the Commission. As noted in its decree, the application "was supported by 101 witnesses representing 123 business locations in fifty-eight different communities in all sections of the State. A few of these witnesses outlined their interests as consigneees; a great majority, however, were shippers engaged in the manufacture, sales, distribution, or service of various products. Products for which all witnesses seek the Applicant's transportation service are of necessity small in size and light in weight. A few illustrative examples of such products would include automotive supplies, novelties, apparel, hardware, jewelry, and printed materials." Although there was supporting evidence for all the service features offered by U.P.S., those most frequently mentioned as necessary and desirable were the automatic pickup service, the overnight delivery and the rates which make the use of this service practical as an alternative to uninsured parcel post. The record makes it abundantly clear that the bulk of the small parcel traffic which would be developed by U.P.S. is now handled by United States parcel post and the comparisons by witnesses of proffered services and rates were almost exclusively as between U.P.S. and parcel post. The Commission could properly conclude that parcel post service is unsatisfactory, primarily because of lack of pickup service, high incidence of loss and damage to parcels, time consuming procedures, insurance, tracing and lack of dependability as to time in transit and delivery. U.P.S. could reasonably expect to acquire some traffic that is now handled by shippers in their own vehicles. As to small parcel traffic now

handled by common carriers, it appears that wherever it is now practical to use existing motor common carrier service rather than parcel post service, it will ordinarily be equally practical in the future to use the same carrier service rather than the new U.P.S. service. Most shippers testified that they would continue to use motor common carrier service to the same extent it is now currently utilized. There was also evidence to support the Commission's finding that "some Maine businesses have indicated they are losing sales and customers to their competitors located in neighboring states, who thereby (i. e., by U.P.S. interstate service) can give better delivery service to their Maine customers than Maine shippers can give without the (U.P. S. intrastate) service."

On the basis of the public testimony, the Commission concluded that "passenger bus express, Railway Express Agency and motor common carrier services, which are good for limited purposes, generally failed to meet the transportation needs of the small parcel shipper." The Commission in assessing public convenience and necessity cannot be expected or required to ignore the practical facts of life in the field of small parcel transportation. It is apparent that the shipper in this field, faced with a choice between inadequate parcel post service and the service presently available from motor common carriers, usually chooses parcel post as more nearly meeting his requirements. It is equally clear, however, that given a choice between parcel post and the specialized service offering of U. P.S., the shipper will ordinarily select U. P.S. The implications from such evidence with respect to public convenience and necessity are inescapable. Such was the reasoning of the Interstate Commerce Commission in United Parcel Service of New York, Inc., 79 M.C.C. 629, 652 (I.C.C. 1959), aff'd sub nom. Yale Tranport Corp. v. United States, 185 F.Supp. 96 (S.D.N.Y. 1960), aff'd per curiam, 365 U.S. 566, 81 S.Ct. 754, 5 L.Ed.2d 806. It is understandable that the Truckers, engaged as they are primarily in the transportation of general freight, do not and cannot reasonably be expected to offer the kind of small parcel service that is the specialty of U.P.S. On the other hand, as already noted, the evidence fully supports the conclusion of the Commission that there are sound practical reasons why a relatively small proportion of the small parcel traffic has been and will in the future continue to be handled by the Truckers. There was evidentiary justification for the finding that the grant of the proposed authority will not result in serious loss of traffic to the Truckers nor have any significant adverse effect upon them.

14. Did the Commission err in granting applicant authority to serve points for which it did not prove public convenience and necessity?

■ We have adverted to the statutory recognition of periodic or irregular departures from regular routes. Many of the shipper witnesses testified that they shipped from time to time to points throughout the State. The argument offered by the Truckers on this point was made to and rejected by the Pennsylvania Court in these terms:

"\* \* \* and it is not necessary that applicant establish a present demand for the service in every square mile of the territory certificated; proof of necessity within the area generally is sufficient." Zurcher v. Pa. Pub. Util. Com. (1953) 173 Pa.Super. 343, 98 A.2d 218, 221.

The deficiencies of parcel post were shown to be the same all over the State, and were not peculiar to any point or points therein.

15. Did the Commission err in granting applicant authority to serve as a common carrier all off route points not named in its grant of authority?

This point has been fully covered above.

16. Did the Commission err in granting authority between points now served by a single carrier?

17. Did the Commission err in granting authority between points as to which overnight service is available?

Transportation of small packages by general freight carriers, as already noted, is not a practical alternative to parcel post. To attempt to delete a few points here and there would serve no useful purpose and would only deprive the public of the type of complete service offered by U.P.S. and which the Commission has found to be required by public convenience and necessity.

18. Did the Commission err in ruling that applicant's proposal to offer service at lower rates than those currently filed by Truckers may be considered in supporting its grant of authority to applicant?

19. Did the Commission err in admitting evidence of proposed rates in determining whether the proposed operation is required by the convenience and necessity of the public?

█ In Railway Express Agency, Inc. v. Public Utilities Com'n., (1962) 173 Ohio St. 69, 180 N.E.2d 10, 12, the Supreme Court of Ohio had occasion to consider the proper use of rate evidence under circumstances like those in the instant case. The Court accepted and adopted as soundly based the conclusions of the Examiner, in these terms:

"This examiner does not believe, as a general proposition, certificates of public convenience and necessity can be granted solely on the theory of lower rates alone. However, this examiner *desires it to be clearly understood* that he is not recommending the granting of the instant (U. P.S.) application solely on the basis of applicant's lower rates *alone*. There is a more compelling reason, such being that there is a 'pressing' need for the service applicant proposes to render for that traffic moving in the parcel post system, and that the services of the existing common carriers are not reasonably adequate to meet the needs of shippers in the transportation of such traffic."

The Commission in the instant case was careful to make proper use of the rate evidence. We note in the findings:

"As we have studied the record and briefs before us, we have noted a frequent objection pertains to our consideration of rates in determining whether the proposed operation is required and permitted by the convenience and necessity of the public. Practically all testimony relating to this issue was admitted in evidence by the Examiner over the objection of the Protestants. After careful consideration of this problem, we would adopt the Examiner's ruling admitting this evidence as our own. We hasten to point out, however, that *we view the consideration of rates as but one factor in this case.* More is involved here than a mere proposal to offer service at lower rates than other modes of transportation regulated by this Commission." (Emphasis supplied.)

Quoting at length from United Parcel Service of New York, Inc., Common Carrier Application, supra, the Commission included this language of the I.C.C.:

"There is no gainsaying the fact that the shippers supporting this application are highly concerned with cost considerations in connection with the movement of their traffic. If otherwise, they would hardly seem to qualify as prudent businessmen. However, their concern over cost considerations does not operate to submerge or cancel out their demonstrated need for the proposed service. Applicant would not only provide them with the type of service required, but would do so *at a cost approximating that of parcel post service.* Moreover, it is evident that applicant is not trading simply on an offer of low rates. Rather, it is offering a completely modernized transportation service, the equal of which is not available in the involved territory, for the movement of small packages at a minimum cost due to the fact that its experience over the years

has led to the development of highly specialized and efficient methods of handling small packages." (Emphasis supplied.)

We recognize as did the Commission that this is not a rate case and rates are not generally in issue in application cases. But here the impact of rates was given a limited and proper consideration as an exception to the general rule. The Commission had a right to determine what the flow of small parcel traffic is and where it may reasonably be expected to be located. In this case an important rate comparison can be made between motor common carrier rates and parcel post rates as explaining why the bulk of small shipments are by parcel post. This leads directly to a comparison of U.P.S. proposed rates and parcel post rates as one factor in determining the need for U.P.S. service. There is no criticism of motor common carrier rates which must take into account the fact the major portion of their freight is heavier and bulkier than the small parcels involved in this application. The incontrovertible economic fact is however, that no carrier, not even U.P.S., could attract any substantial portion of parcel post traffic unless it offered rates competitive with those of parcel post. We find no error in the restricted use of rate evidence by the Commission in this case.

20. Did the Commission err in overruling Truckers' objection to the "convenience and need" question asked of each public witness?

■ Each public witness was permitted over objection to answer a lengthy question. In substance the question first enumerated the elements of the service being offered by U.P.S. After this preliminary the witness was asked, "In the event such a service were made available to you for intrastate deliveries throughout the State of Maine, would that be a convenience and fill a need in your business?" Truckers' objection is grounded upon the inclusion of two statements in the introductory portion of the question, 1. "Automatic coverage

against loss or damage up to $100 per package, but without the necessity of filling out complicated forms, will be provided;" and 2. "Service will be provided at cost to the shipper which is competitive with the cost of using uninsured parcel post." Truckers contend that its prior arguments with respect to U.P.S. proposed documentation, the use of rate evidence and the $2.00 pickup charge have application here and make the question inadmissible. In the light of our prior discussion of those three points it is unnecessary to enlarge further upon our views. It suffices to say that no reversible error is shown.

■ 21. Did the Commission err in ruling that 35 M.R.S.A., Sec. 1554 will not apply to joint rates filed by common carriers between points served by the applicant as a single line carrier?

35 M.R.S.A., Sec. 1554 provides in part:

"Every holder of a certificate of public convenience and necessity shall file with the commission a schedule or schedules showing its rates or charges for service rendered or furnished or to be rendered or furnished within the State, including rates or charges established jointly with other such holders *to the extent authorized by the commission over routes not served by a single common carrier."* (Emphasis ours.)

The Commission answered Truckers' contention in this wise: "We have already ruled otherwise on this point in Application of Railway Express Agency, Inc., Docket X–2670, (November 3, 1965). There we expressed our opinion that the service was of a different nature from that the Protestants offer and consequently did not prevent them from filing joint rates. We believe the same principle has application here for the same reason." In its decision in Railway the Commission emphasized the "many distinguishing characteristics between the express service offered by (Railway) and the general freight service offered

**454**

by the intervening motor carriers. The Commission noted that "both of these services are required in the public interest, and each must be protected from unlawful inroads by the other." The Commission concluded that Railway "will be permitted to continue in effect its single factor express rates applicable between the points it serves in Maine but not to the exclusion of the local or joint single factor freight rates of motor common carriers." We are satisfied as was the Commission that the prohibition in Sec. 1554 was not intended to preclude the filing of joint rates by motor common carriers carrying general freight merely because the same route was served by a single carrier engaged in a very different and highly specialized form of transportation. In our view the statutory restriction was designed to prevent the use of joint rates as a means of "unfair or destructive competitive practice," a phrase inserted into Sec. 1554 by P.L. 1967, Ch. 392. The construction placed upon the language by the Commission seems to us to carry out its manifest purpose.

22. Did the Commission err in admitting into evidence Exhibits 7, 10, 11, 12, 15, 18, 19, 20, 22, 25 and 32?

No useful purpose will be served by discussing in detail the exhibits objected to. Certain of them were relevant to the fitness and ability of U.P.S. to render the proposed service. They also bore on the uniqueness of U.P.S. proffered service. The use of exhibits which tend to save countless hours of examination is common practice in hearings before the Commission, a body with expertise and long accustomed to analyzing and making proper use of materials in such form. Where exhibits represented the summation of a mass of material, such material was made available to opposing parties if they cared to inspect it. The requirements of State v. Huff, (1961) 157 Me. 269, 171 A.2d 210 were satisfied. No prejudicial error is apparent.

We conclude that the Commission's determination that public convenience and necessity require the granting of the U.P.S. application should be affirmed.

*Appeal denied.*

WILLIAMSON, C. J., did not sit.

TAPLEY, J., was present at the argument but retired before rendition of decision.