### In re Franklin W. POWELL d/b/a Swan's Express.

### In re Application to Amend COMMON CARRIER CERTIFICATE NO. 40.

Supreme Judicial Court of Maine.

June 7, 1976.

Southard, Hunt & Hebert, by Frank E. Southard, Jr., Augusta, for plaintiff.

Murray, Plumb & Murray, by Peter L. Murray, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

PER CURIAM*

Franklin W. Powell, d/b/a Swan's Express of Fryeburg, Maine, is the holder of regular route common carrier authority in both intrastate and interstate commerce serving the cities of Portland, South Portland and Westbrook and the towns of Gorham, Standish, Steep Falls, Baldwin, Hiram, Brownfield, Denmark, Fryeburg, Sweden, Lovell and Stow. This territory is essentially a route from Portland to Fryeburg along Route 114 around the southern end of Sebago Lake. On February 19, 1974, Swan's filed an application with the Public Utilities Commission to amend its common carrier certificate to include authority to operate an additional route serving the cities of Portland, South Portland and Westbrook and the towns of Windham, Sebago, Raymond, Casco, Naples, Harrison, Bridgton and Fryeburg with intermediate pickup and delivery service in both directions. This additional route would also run between Portland and Fryeburg but would follow the northern side of Sebago Lake along Route 302. The distance between Portland and Fryeberg by either route is approximately the same.

---

* The opinion in this case was written by WEATHERBEE, J., and adopted by the Court after his death.

Sanborn's Motor Express, Inc. (operating the rights of Congdon Transportation) and Cole's Express were permitted to intervene in the proceedings before the Commission. Sanborn's holds or operates interstate and intrastate rights along the entire territory now sought by Swan's as an additional route. Although Cole's Express does hold interstate authority to serve the entire territory, its intrastate rights have been limited to Portland, South Portland and Westbrook and it has not given regular interstate service to most of this territory. Sanborn's is therefore the only carrier now serving the territory embraced by Swan's application.

During the seven days of hearings before the Commission, the applicant supported his own testimony with that of thirty-seven public witnesses, including representatives of local and interstate shippers, local and interstate receivers, and interstate carriers. The intervenors presented six employee witnesses, two witnesses from other carriers and six public witnesses in an attempt to rebut the applicant's showing. On March 27, 1975, the Maine Public Utilities Commission approved Swan's application and authorized him to operate as a common carrier over the additional route. The Commission ruled that

" . . . based upon our consideration and appraisal of the voluminous record and briefs of the parties before us, we find that the public need for the service Applicant proposes in both intrastate and interstate commerce outweighs the effect it will have upon the existing transportation services.

We also find that the Applicant has met the requirements of 35 M.R.S.A. §§ 1551–1552 . . . and that the public convenience and necessity require the Applicant's proposed service."

The Intervenors appealed from this decision, raising the following issues: (1) The Commission's finding of public convenience and necessity was not supported by sufficient evidence. (2) The authority granted was broader than that justified by the evidence. (3) The evidence at best justified only a service complaint action, not a grant of additional authority. (4) The Commission did not adequately consider the adverse effect of the granted authority on existing transportation facilities.

We deny the appeal.

To address these issues satisfactorily, this Court must review the evidence before the Commission. From a transcript of almost 850 pages and numerous exhibits, we summarize the following:

Swan's Express is a small motor common carrier owned and operated by Franklin W. Powell. Swan's has been providing same-day service in interstate and intrastate commerce between Portland, via the various communities around the southern end of Sebago Lake, and Fryeburg, its headquarters. To provide this same-day service, Swan's trucks leave Fryeburg each morning for the Portland area, picking up freight from shippers along the route and arriving at approximately noontime. There, the freight is delivered directly to the consignees or to connecting interstate carriers and lading is picked up from connecting carriers and Portland area shippers to be delivered to consignees on the return trip to Fryeburg in the afternoon. Thus, a Portland area shipper or connecting carrier who has freight bound for a town in the Fryeburg area can give that freight to Swan's around noontime and be assured that it will be delivered to its consignee the same afternoon.

In its application, Swan's proposes, by using the same method of operation, to extend this same-day service to the towns between Portland and Fryeburg situated on the northern side of Sebago Lake. One or more trucks would leave Fryeburg each morning via Route 302 to Portland, pick up inbound freight on the way, deliver the freight and pick up outbound freight in the early afternoon. The trucks would return in mid or late afternoon and deliver the freight on the return journey.

At the time of Swan's application, the only other intrastate carrier servicing the territory involved in that application was Sanborn's Motor Express. Sanborn's service has typically been overnight or next-day service. Under Sanborn's schedule, trucks leaving its Scarborough terminal pick up freight in the Portland area. This freight is brought to the terminal in the late afternoon and is dispatched to the consignees the following morning. With the exception of freight picked up in the very early morning, intrastate freight received by Sanborn's will not be delivered until some time during the following day. Connecting interstate carriers wishing to transfer shipments into the territory are required to bring their lading to Sanborn's terminal between 10:00 and 4:00 each day. As a result, interstate shipments are not delivered until the day after they arrive at the Portland terminal. Certain of Sanborn's customers in this territory have specifically complained to it about the lack of same-day service and have been told that Sanborn cannot offer this service.

At the hearing, the applicant presented thirty-seven witnesses from commercial interests in the territory and other carriers who unanimously expressed their desire for the type of same-day service that Swan's would offer in the territory. It would be pointless to summarize this testimony in any detail beyond noting that the witnesses represented a wide cross section of the interests which could be expected to benefit from the approval of Swan's application. Among these representatives were electric and building supply companies, retail stores, automobile dealerships, electronic equipment manufacturers and distributors, summer camps, the town of Bridgton, and the Northern Cumberland Regional Memorial Hospital. These and other witnesses detailed the need of contractors and housing manufacturers for prompt same-day shipments of parts and components, the need of drug companies for expedited service to drug stores and hospitals, the need of various businesses for the prompt shipment of spare parts, and the need of small merchants for the prompt shipment of inventory. Many of the witnesses testified that because of the lack of same-day service they were forced to send their own vehicles to pick up freight in Portland.

Sanborn's presentation was an attempt to show that the adequacy of its own service precluded the need for any additional service in the territory. It also demonstrated that when Congdon Transportation (Sanborn's predecessor in operating rights) was offering a limited same-day service in the territory, most of the businesses used that service infrequently or not at all. Sanborn further claimed that the authorization of the additional route would adversely affect its interests by causing a $50,000 annual revenue loss. The Commission agreed that the authorization would result in some loss of traffic by Sanborn but in an amount appreciably less than that figure. The Commission also found that Sanborn's overall service was adequate except in its failure to provide same-day service, in which regard it was found to be "less than totally adequate".

### I. The Commission's Finding of Public Convenience and Necessity

The application of Swan's Express for additional common carrier operating authority is controlled by 35 M.R.S.A. § 1552 which requires, *inter alia*:

"No . . . certificate shall be issued unless and until the applicant has established to the satisfaction of the commission that there exists a public necessity for such additional service and that public convenience will be promoted thereby."

Section 1552 bespeaks a legislative intent to preserve competition among motor carriers to some extent. At the same time, it minimizes carriers' hurt to each other in pursuit of the limited rivalry the law allows them. The duty of the Public Utility Commission is to accommodate

these conflicting policies, a task in which it is not without statutory guidance. For example, the limitation of entrance of new competitors into the field is achieved by the requirement that a new entrepreneur may not be admitted unless the public need and convenience require it. Public need and convenience, we have said, means the need and convenience of the general public and not that of any individual or group of individuals. *In re Chapman,* 151 Me. 68, 116 A.2d 130 (1955). The Commission here concluded that the applicant had produced substantial evidence of the public need for his proposed service. Against this showing, the Commission, as also required by section 1552, balanced the evidence of adverse economic effect upon existing carriers and found that the demonstrated need for the applicant's proposed same-day service outweighed that effect.[1]

The intervenors now argue that the difference between the next-day service offered by Sanborn and the applicant's proposed same-day service is insufficient to support the Commission's finding that such same-day service is required by the public convenience and necessity. It supports this claim by two distinct arguments which we consider separately.

First, the intervenors directly attack the factual basis of the Commission's finding by arguing that the evidence showed applicant's proposed service would result in speedier delivery only in a few very special circumstances. The intervenors thus attempt to impeach the Commission's finding of a public need for Swan's service and that the public convenience will be promoted by its availability. We find no merit to this argument and conclude that the record does show that the public need and convenience require the additional service.

■■■ It is well-established that factual findings by the Public Utilities Commission are final if supported by substantial evidence in the record. *In re Lefebvre,* 343

A.2d 204 (Me.1975); *In re United Parcel Service, Inc.,* 256 A.2d 443 (Me.1969); *Public Utilities Commission v. Johnson Motor Transport,* 147 Me. 138, 84 A.2d 142 (1951). More than 30 witnesses from the territory in question testified that the next-day or overnight service presently offered by Sanborn was inadequate for many of their needs and that those needs would be better served by the same-day service proposed by the applicant. We believe that the Commission could reasonably have concluded that these witnesses, drawn from small towns in a restricted area, represented the interests of the general public. The record clearly shows that Sanborn's schedule in most instances does not allow same-day service in this area. The record shows with equal clarity that under the applicant's proposed same-day service, a shipment available any time before noon will be delivered to its destination on the same day. While mere force of numbers will not necessarily constitute convincing evidence, in *Lefebvre,* a case very similar to the present one, this Court found that the testimony of 17 witnesses was sufficient to justify the Commission's conclusion for same-day service. It appears to us that a much greater volume of evidence, of apparently equal quality as to credibility, a fortiori supports the Commission's findings here. We will not disturb the Commission's finding that public need and convenience require same-day service in the territory in question and that Sanborn's has not been adequately fulfilling that need.

■■■ The intervenors further claim that the only difference between Sanborn's service and that of the applicant is one of scheduling and that such difference is insufficient as a matter of law to support a finding of public necessity and convenience. Certainly, minor scheduling differences will not, by themselves, justify an additional grant of authority. *See In re Chapman, supra.* It is equally clear, however, that the frequency and speed of deliveries is an

---

1. The Commission determined that the effect, if any, on Cole's Express would be de minimis.

important element in evaluating the desirability of the service offered by carriers. *In re Lefebvre, supra; In re United Parcel Service, Inc., supra.* As noted above, the evidence showed a public need for Swan's same-day service in the territory covered by the application and the inadequacy of Sanborn's present service in regard to that need. Given this strong affirmation of the necessity of the schedule offered by the applicant, the Commission's action was wholly justified.

## II. The Scope of the Authority

The evidence addressing the issue of public convenience and necessity related almost exclusively to the applicant's pick-up and delivery schedule. The Commission's decree ordered:

> "That Maine Intrastate Common Carrier Certificate No. 40 issued . . . to Franklin W. Powell . . . be and the same hereby is amended by adding authority to transport general freight and merchandise as follows:
>
> Between Portland, South Portland, and Fryeburg, Maine, serving Portland, South Portland, Westbrook, Sebago, Windham, Raymond, Casco, Naples, Harrison, Bridgton, and Fryeburg both inclusive and with intermediate pick up and delivery service in both directions and at all points."

The intervenors argue that the scope of this authority is greater than that justified by the evidence and permits the applicant to operate on a schedule identical to Sanborn's. The intervenors are apparently asking this Court to invalidate the Commission's decree for its failure to conform to the proof.

■ Any detailed consideration of this issue is foreclosed by our opinion on the same matter in *In re Lefebvre, supra,* in which Sanborn also appeared as intervenor. We noted above that the Commission here found that Sanborn's service was inadequate in regard to its provision for same-day service. We said in *Lefebvre*:

> "Once inadequacy of existing service is determined the Commission may, in its discretion, authorize competition and need not limit the new carrier to providing service restricted to areas of specific demonstrated inadequacy. . . . The Commission has broad discretion in deciding to what extent competition would serve the public interest. . . ." (Citations omitted.) 343 A.2d at 210.

■ The determination of the public needs in the field of regulated utilities is within the expertise and experience of the Commission. In the absence of any abuse of that informed discretion, this Court will not substitute its judgment for that of the Commission. *Biddeford & Saco Gas Co. v. Portland Gas Light Co.,* 233 A.2d 730 (Me.1967); *Petition of O'Donnell,* 147 Me. 259, 86 A.2d 389 (1952).

## III. The Service Complaint

The intervenors claim that Swan's application for additional authority should have been handled as a service complaint. They argue that if Sanborn's service was inadequate, the proper remedy was a complaint under 35 M.R.S.A. § 291 and, following a hearing on that complaint, an order by the Commission of changes in the service as shall be just and reasonable. 35 M.R.S.A. §§ 294, 296. No grant of additional authority, the argument continues, should have been allowed until the existing carrier had been given an opportunity to furnish such additional service. We disagree.

■ The public need for same-day service and Sanborn's failure to provide it were clearly demonstrated. Before granting the authority to the applicant, the Commission was obligated to consider the effect of that grant upon the intervenors. It was also obligated to consider the effect of the grant upon the highways and existing transportation facilities, as well as safety and the regulation of congestion on those facili-

ties. 35 M.R.S.A. § 1551. As these factors suggest, the prevention of unnecessary duplication in public service enterprises is an element to be considered, at least by implication, in the evaluation of the need for a grant of additional authority in an area already served by existing carriers. The law does not, however, require that the Commission's power to grant the additional authority be circumscribed by any rule vesting existing carriers with an opportunity to remedy inadequacies before an additional grant of authority can be allowed. The limited rivalry which the law permits common carrier operators would be vitiated by a rule mandatorily precluding a grant of additional authority for the sole reason that the territory was already served by a carrier. *See Schaffer Trans. Co. v. United States,* 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed. 2d 117 (1957).

In short, while the Commission could have remedied the scheduling inadequacies by treating the matter as a service complaint, it was not bound to do so. In any application for additional authority, the Commission must consider the existence of other transportation facilities and may consider the ability of those facilities to provide the type of service proposed by the applicant; but the mere existence of other facilities does not forbid the grant of the additional authority. The evaluation of the public needs in regulated industries and the provision of the manner in which those needs may best be fulfilled is within the informed discretion of the Commission, whose judgments will not be lightly disturbed. *Dickinson v. Maine Public Service Co.,* Me., 244 A.2d 549 (1968). The service complaint is not an exclusive remedy and the Commission acted within its authority when it granted applicant the additional authority.

IV. *The Effect on Existing Transportation Facilities*

The Commission must consider the effect of the grant of a common carrier certificate on existing facilities. 35 M.R.S.A. § 1552. After so considering here, the Commission found that the grant of authority would entail some traffic loss by Sanborn (although not to the extent of the $50,000 claimed), but concluded that the proposed service would promote new revenue by eliminating the need for private trips to Portland. It further concluded that the need for the proposed service outweighed the effect it would have on existing facilities. The intervenors now argue that the adverse effect on Sanborn's revenues will be substantial and that as the Commission failed to consider adequately the effect of the additional authority, its decree should be reversed.

The statute does not prescribe rigid quantitative standards, but leaves the evaluation of the effect of competition to the discretion of the Commission. Again, it is a question of the Commission's accommodation of the conflicting policies of public utility law.

"The Commission may permit competition, having broad discretion when deciding to what extent competition is needed and its probable effect on existing carriers." *In re Lefebvre,* 343 A.2d at 208.

We note, as the Commission doubtless did, that the entire Sanborn system earned a $1 million profit in 1973. The Commission specifically rejected as too high Sanborn's $50,000 estimation of loss from the route. The record convincingly demonstrates that the figures submitted by Sanborn are speculative. The record does not show that Sanborn's service will be curtailed as a result of Swan's authority. The record strongly suggests that the route now generates sufficient revenue to support two carriers, and the Commission found that the additional service would increase that revenue. No evidence of any abuse of discretion is apparent in the Commission's decree.

The entry will be:

Appeal denied.

All Justices concurring.