**458** ■

STANDISH TELEPHONE COMPANY
and China Telephone Company

v.

PUBLIC UTILITIES COMMISSION and
Saco River Communications
Corporation.

Supreme Judicial Court of Maine.

Argued June 10, 1985.

Decided Oct. 11, 1985.

Verrill & Dana, by Michael T. Healy (orally), Portland, for the plaintiffs.

James A. Buckley (orally), Public Utilities Com'n, Augusta, for defendants.

Rackemann, Sawyer & Brewster by Harold J. Carroll (orally), Nicole L. Rives,

Boston, Mass., for Saco River Communications Corp.

Before McKUSICK, C.J.,[*] and VIOLETTE, WATHEN, GLASSMAN, SCOLNIK, JJ. and WERNICK, A.R.J.

WERNICK, Active Retired Justice.

On October 27, 1983, Saco River Communications Corporation [1] (Saco River), on behalf of its subsidiary corporate division Communications Design, instituted a proceeding before the Public Utilities Commission (Commission). Saco River asked that, pursuant to 35 M.R.S.A. §§ 2301 and 2302 (Supp.1984), respectively, the Commission authorize Communications Design to act as a telephone company and grant to it, as an authorized telephone company, a certificate of public convenience and necessity allowing it to provide discounted intrastate long distance telephone service anywhere in Maine by the resale of tariffed services purchased from other telephone companies.[2]

The Commission granted the requested certificate of public convenience and necessity, after having found that the proof met the three-pronged test set out in *Re Pine Tree Tel. and Tel., Application for Public Convenience and Necessity*, No. 82–49, slip op. at 2 (Me.P.U.C. Oct. 14, 1982). That test requires a showing that (1) public need for the proposed service exists; (2) the applicant has the technical ability to provide the service; and (3) the applicant possesses adequate financial resources to complete the project.

The Commission permitted several persons to intervene in the proceeding.[3]

---

[*] McKusick, C.J., sat at oral argument but participated no further.

1. Saco River Communications Corporation is a wholly owned subsidiary of Saco River Telegraph and Telephone Company.

2. The initial proposal was for Communications Design to provide, in addition, toll services that would include toll calls over its own lines or over microwave facilities. During the proceeding, the proposal was modified by having it confined to the reselling of intrastate tariffed services available from other telephone companies.

3. Intervenors were the Public Advocate, New England Telephone Company, Continental Telephone Company of Maine, Standish Telephone Company, China Telephone Company, Community Service Telephone Company and the Telephone Association of Maine.

Standish Telephone Company (Standish) and China Telephone Company (China) are the only participants in the proceeding who have seen fit to appeal the January 3, 1985 Order of the Commission authorizing Communications Design, operating as a telephone company, to provide discounted intrastate long distance telephone service anywhere in Maine.[4]

In their appeal, Standish and China make two basic contentions: first, the standard the Commission used in reaching its conclusions led the Commission to commit an error of law because, the argument goes, it enabled the Commission to authorize another public utility to compete with Standish and China in their service markets without the Commission's having made a prior finding that the existing service of Standish and China was inadequate; and, second, the Commission was guilty of an abuse of discretion in (a) allowing the new service upon an insufficient showing of public need for it and (b) ignoring, or inadequately considering, the competitional effects of the new service upon the existing independent telephone companies.

We reject the contentions and affirm the Order of the Commission.

### Factual Background

The opportunity to offer discounted intrastate long distance telephone service in Maine arises by reason of certain services currently provided under the tariffs of the New England Telephone Company and the various independent telephone companies operating in Maine. In addition to the intrastate long distance service that small volume long distance customers use, known as Message Toll Service (MTS), in which the caller pays a per minute fee with a higher cost for the first minute of the call, the current tariffs provide Wide Area Telephone Service (WATS) and Foreign Exchange (FX) lines. These latter are lesser expense long distance services that are of economic benefit to large volume users. WATS allows a customer to make any intrastate long distance call without incurring MTS charges, but it requires a substantial initial payment per month in addition to its reduced per minute fee. For a fixed monthly charge, FX provides a direct line from the customer's phone to a central exchange other than the one serving the area where the customer is located. For example, a Portland customer with an FX line to Bangor can call Brewer (a city in the Bangor exchange area) on an FX line without incurring any MTS charges.

Under Saco River's proposal, Communications Design would provide customers with a phone number in their local exchange as well as an identification number. The customer would first dial the local number, then his identification number and then the intrastate long distance number he wished to reach. A Communications Design switch would send the call over WATS and FX lines leased by Communications Design from New England Telephone and the independent phone companies. Communications Design would buy WATS and FX in bulk and resell those services to its customers. This process would give the customers of Communications Design lower cost intrastate long distance service in return for their putting up with the inconvenience of dialing many extra numbers and sometimes waiting for one of Communications Design's heavily used discount lines to become available.[5]

---

4. At present, Communications Design has no plan to enter the service areas of Standish and China. Since, however, the Commission authorized such entry whenever Communications Design may see fit to undertake it, Standish and China are aggrieved and by their appeal challenge the authorization that can affect their service areas.

5. The Commission explained that it can be a profitable enterprise to resell WATS and FX purchased from other telephone companies "because of the taper in the WATS rate structure and the low fixed cost for the FX line.... As circuits are utilized to the maximum, the cost per minute of use declines. 'Packing' the lines results in lower monthly bills for small business users and a profit for the reseller."

In a previous proceeding, *In Re New England Tel. and Tel. Co.*, No. 82–124, slip op. at 80–86 (Me.P.U.C. April 26, 1983), the Commission eliminated tariff restrictions on the reselling of WATS and FX lines.[6] At that time, the Commission gave notice that it would be receptive to proposals for restructuring MTS, WATS and FX rates, to have them move more closely towards being cost-based and thus to tend to shut off opportunity for profit-making in the resale of WATS and FX to small volume callers. The telephone companies have not yet applied for a restructuring of tariffs, however, and so the current tariffs continue to encourage Communications Design's venture.

### 1.

The principal contention of Standish and China is that, in relying on the three-part test of *Re Pine Tree Tel. & Tel., supra*, the Commission fell into the error of failing to find one element that, it is argued, is a prerequisite for authorizing a competing utility to enter the service market of an existing utility: that existing service is inadequate.

The contention fails. It reflects a misconception of the meaning of the finding that a public *need exists* for a proposed type of service—a misconception that arises, no doubt, from a failure to recognize an ambiguity lurking in the phrase "inadequacy of existing service".

Analysis of our decision in *In Re Lefebvre*, 343 A.2d 204 (Me.1975) makes the ambiguity apparent. In *Lefebvre* the existing service was held "inadequate" in two aspects (1) it did not provide at all the "same day and Saturday service" for which there was a public need (p. 206); and (2) such service as was in fact being provided was being provided in a deficient manner, in that the "over-night service was ... slow and there were some missed pickups" (pp. 206–7). Our decision in *In Re Powell*, 358 A.2d 522 (Me.1976) suggests the same critical distinction. In *Powell*, however, unlike *Lefebvre*, the existing service was being well provided. Its inadequacy was that it failed to provide an additional particular service for which a public *need existed:* "same-day service". *Powell*, at 527.

*Lefebvre* and *Powell* thus make plain that, even if such service as is actually being provided is being provided well, it is nevertheless inadequate if it is failing to provide a particular service for which there is a public need. This is the square decision in *Powell*, where the only inadequacy of the existing carrier's service was its failure to provide publicly needed "same-

---

**6.** By allowing resale of telephone services, the Commission followed the lead of the Federal Communications Commission, which had earlier ordered this type of deregulation of the telecommunications industry. In its order allowing resale, the FCC well summarized the many benefits of that policy:

> [We] find substantial evidence in the record that a number of public and private benefits may be anticipated to flow from resale and sharing of domestic public switched network services. The comments of potential resellers and sharers persuade us that the elimination of these restrictions will have a number of salutary public interest effects, including the fostering of innovation and the introduction of new technology, especially new ancillary devices, and the spreading of peak-period usage. Also, resale and sharing can be expected to promote better management of communications networks, a reduction in wasted communications capacity, and the growth of customer networks for particular applications.

> We foresee the development of competition in the provision of telecommunications services, new entry into telecommunications markets, and stimulation of demand. Moreover, lower rates for small to medium domestic public switched network consumers should result. We also anticipate a movement on the part of carriers toward cost-based rates, an important regulatory goal, as the prospect of arbitrage actually arises....

> Conversely, there is no evidence in this record which convincingly demonstrates that any public detriments would result if WATS, ... or other public network switched services were not subject to resale and shared use restrictions.... [N]o party, including AT & T, argues that there would be any harm to the public interest as a result of resale and sharing.

> *In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services*, 83 F.C.C.2d 167, 172 (1980).

day" service, over and above the "overnight or next-day" service that the carrier was in fact providing, and providing well.

*Powell* thus removes any potential for a misunderstanding of the discussion in *Lefebvre* concerning the deficiencies in the way the existing carrier's service, such as it was, was being provided. *Powell* decides that insofar as inadequacy of existing service may be a factor relevant to the granting of a certificate of public convenience and necessity, the finding of a *public need* for an additional type of service not being currently provided is *in itself* a finding that the existing service is inadequate. With this point clarified, it becomes evident that the consideration in *Lefebvre* of the deficiencies in the service the existing carrier was actually providing was material only to a separate contention being made in *Lefebvre* that has no bearing on the case at bar. That separate contention was: even if the Commission acted without error in granting a certificate of public convenience and necessity to a new carrier to provide a publicly needed service not currently provided, the Commission was nevertheless wrong in allowing the competing carrier to provide service the existing carrier was already providing, but providing deficiently, without first giving the existing carrier opportunity to remedy the deficiencies in its existing service.

■ In rejecting this contention, we made plain in *Lefebvre* that the law of Maine does not require that an existing public utility must be afforded opportunity to remedy the deficiencies in such service as it does provide before a new utility may be authorized to provide the same service. In *Powell*, we took the additional step of making the same point as to the situation

where such service as is currently being provided is being provided well enough, but it is nevertheless inadequate by failing to provide an additional type of service needed by the public. *Powell* decides that in such context the law of Maine does *not* require that the existing utility shall have the opportunity to furnish the publicly needed additional service before a new utility may be authorized to provide it.

■ The Commission, therefore, did not fall into error because it used the three-pronged test set out in *Re Pine Tree Tel. and Tel., Application for Public Convenience and Necessity, supra,* in arriving at its determination to grant Communications Design the requested certificate of public convenience and necessity. One part of that test requires the Commission to find that a public *need exists* for the service proposed to be provided. By having made that finding here, the Commission automatically found that the currently provided service is inadequate. To find that a public *need* for a particular type of service *exists* means that such particular service is not presently being provided. (Were it provided, the *need* would *not exist,* having been satisfied). And as decided in *Powell, supra,* in the evaluation of whether another public utility should be granted a certificate of public convenience and necessity, existing service that fails to provide a particular type of service for which a public need exists [7] is, for that reason alone, inadequate.

2.

Standish and China make the alternative assertion that the Commission erroneously applied to the present circumstances the three-part test it saw fit to use, in that (a)

---

**7.** We note, here, in more detail than we may have stated above, how the service Communications Design proposes to provide differs from, even though it is comparable to, the existing service. Standish and China now afford small volume users direct dial phone service at the MTS price. The WATS and FX service proposed by Communications Design will cost small volume users less than the MTS price they

now must pay, but such users will have inferior access to the telephone network. The customers of Communications Design will have to dial the company's local number, their identification number, and the phone number of the party they wish to call. In addition to this inconvenience, the customers will have to "queue up" until one of Communications Design's circuits becomes available.

the Commission found public need for the additional service without sufficient evidentiary support for such finding, and (b) the Commission ignored, or inadequately considered, the impact of the proposed service on the independent telephone companies.

### 2(a).

Without having testimony by various individuals stating their desire for, or plans to use, discounted intrastate long distance service in Maine, the Commission made the following findings as to public need.

> The public need for resale of WATS and FX services is clear. In recognition of the fact that the need for service is closely dependent on cost, we believe it fair to assume that the public always desires (and, therefore, there is a public need for) comparable service at lower costs. Currently WATS and FX services are attractive and cost justified for high volume users only. Discount toll service is attractive to small business users who do not make enough calls to justify purchasing WATS and FX lines, but who find daytime toll and first minute use costly. Reseller's rates are constant rates which eliminate the high first minute charges and which discount the additional minute rate as well.... [Communications Design] seeks to fill this "void" in the telephone market.... Mr. Carroll [president of Saco River] testified that there is a "pent-up demand" for resold services in the business and residential communities.... In [*In Re New England Tel. & Tel. Co.*, slip op. at 81] we found that restrictions on resale and sharing were not in the public interest.... We find that these facts form a sufficient basis on which to find that a second utility is required to fill a need not currently met by the existing carriers.

We are satisfied that the Commission acted reasonably, and with support the law recognizes as sufficient, in its evaluation of the public need for the service proposed by Communications Design.

There were two evidentiary sources from which the Commission rationally could conclude that granting the certificate would serve the public's need.

First, as stated in the Commission's Order, the president of Saco River not only testified at the hearing but also mentioned in numerous documents submitted to the Commission that, if long distance services were offered at a discount price, there would be a demand for those services. On several occasions, he discussed the economic barriers to purchasing WATS and FX services faced by small businesses and other small volume customers. In addition, New England Telephone's district manager for rates and tariffs agreed that discount intrastate long distance was unavailable to many callers under the present system.

Second, the Commission was plainly acting within its area of expertise in determining that consumers would purchase a comparable but lower quality long distance service provided at a lower cost. The Commission is entitled to draw upon its experience and expertise in regulating Maine's telecommunications industry. It would have added little of value for the Commission to have had a parade of witnesses testifying to a proposition that ordinary, let alone expert, experience recognizes as obvious: the consuming public wants, in the Commission's words, "comparable service at lower cost".

> The determination of public needs in the field of regulated utilities is within the expertise and experience of the Commission. In the absence of any abuse of that informed discretion, this Court will not substitute its judgment for that of the Commission.

*In Re Powell, supra,* at 529. We discern no abuse of informed discretion and therefore defer to the Commission's expert judgment.

### 2(b).

We disagree with the contention of Standish and China that the Commission

failed to give adequate consideration to the impact of the proposed service on the independent telephone companies. To the contrary, our study of the record discloses that the Commission carefully examined, and dealt reasonably with, the matter of the impact of the reselling of WATS and FX service on the existing telephone companies in this state.[8]

■ Having found, with adequate evidentiary support, that the effect of the reselling of WATS would be minimal, the Commission acted within the limits of sound discretion in allowing it without restriction. As to FX and the economic impact of reselling it, the Commission concluded, and with sufficient basis, that it was impossible to predict with accuracy what the impact would be. Exercising its expert discretion, the Commission saw fit to permit the resale of FX service on a two-year trial basis, after which it would evaluate the matter of impact in light of the data yielded by the trial.[9] Viewed in its entirety, the Order of the Commission allowed the development of a beneficial alternative to MTS service for many callers, while yet proceeding with care to avoid undue detriment to the existing telephone companies. This was a reasonable exercise of regulatory expertise.

The entry is:

Order of the Commission affirmed.

All concurring.

8. The evaluation of "impact" on existing utilities often will involve, as a major concern, the avoidance of wasteful duplication of expensive capital facilities. This is not a factor in the case at bar. Communications Design will not be constructing new telephone lines but will merely be making a more efficient use of existing circuits. For this reason, too, there is no danger of creating an excess of capacity, since Communications Design will be able to provide no more than the maximum of the capacity of the existing circuits it will use.

9. The temporary and trial basis on which the Commission authorized the resale of FX by

Communications Design reflected caution by the Commission in dealing with the foreseeable possibility that resale of FX might reduce an independent telephone company's revenues without producing offsetting reduction of expenses. As part of the experiment, the Commission required Communications Design "to gather data that may be needed in future revisions to existing settlement procedures ... [by] measur[ing] its use of FX lines at all ends, i.e., on calls accessing the switch, on calls from the switch to local measured business lines, and on the local measured business lines themselves."